**Affirmed as Modified and Opinion filed November 1, 2012.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

————————————

## NO. 14-11-00517-CV
————————————

### CITIZENS NATIONAL BANK OF TEXAS, Appellant/Cross-Appellee

### V.

### NXS CONSTRUCTION, INC., Appellee/Cross-Appellant

**On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2004-09001B**

## OPINION

A jury found in favor of NXS Construction, Inc. ("NXS") on its Texas Uniform Fraudulent Transfer Act ("UFTA") claim against Citizens National Bank of Texas ("CNB"). In six issues, NXS contends the evidence is legally and factually insufficient to support the jury's findings and the trial court erred (1) by admitting certain evidence, (2) in its award of attorney's fees, and (3) by including in the judgment attorney's fees and court costs which were previously awarded in another case. In its cross-appeal, NXS contends

the trial court erred by incorrectly assessing interest in the judgment. We modify the trial court's judgment and affirm as modified.

## I. BACKGROUND

Central to this litigation is Westex Communications, LLC ("Westex"), a competitive local exchange carrier ("CLEC") managed by president Scott Hanley. Under the Telecommunications Act of 1996, a licensed CLEC leases telephone facilities from a large telecommunications company, then provides telephone services directly to commercial and residential customers; the purpose of the Act was to create competition in an industry dominated by few companies. A CLEC's customers are referred to as "lines," and a CLEC may sell its lines to other telecommunications companies. Westex leased telephone facilities from SBC.[1]

NXS was a foundation contractor in the construction industry. During 2003, NXS loaned Westex $100,000 and in return received a ninety-day promissory note. In October 2003, Westex defaulted on the note. Around the same time, SecurityComm Group, Inc. ("SecurityComm"), through its president Robert Strange, was negotiating to purchase Westex. SecurityComm purchased Westex in December 2003. SecurityComm agreed that Hanley would remain president of Westex. In connection with SecurityComm's acquisition of Westex, Hanley created Westex Marketing, Inc. ("Westex Marketing"), which provided marketing and sales services to Westex. Additionally, SecurityComm accepted liability for NXS's note[2]; however, SecurityComm defaulted on the note after making one payment of approximately $20,000. In February 2004, NXS sued Westex and SecurityComm on the note.

CNB is a community bank in northern Texas managed by president Marvin

---

[1] For purposes of this opinion, we need not identify exactly the SBC or Southwestern Bell entity from which Westex leased facilities.

[2] Westex also remained liable on the note. *See SecurityComm Group, Inc. v. Brocail*, 14-09-00295, 2010 WL 5514333, at *17–19 (Tex. App.—Houston [14th Dist.] Dec. 28, 2010, pet. denied) (mem. op.).

Singleton.   In 2001, CNB acquired IQC, LLC ("IQC") after certain entities defaulted on a loan.   IQC was a CLEC managed by Peter Grosso.   Banking regulators permitted CNB to become the sole owner of IQC but required divesture of IQC within five years.   CNB retained Grosso as president of IQC and appointed him a vice president of CNB.

In March 2004, Grosso entered into discussions with Hanley regarding selling IQC. During discussions, Hanley explained that he was interested in transferring Westex's lines to IQC because (1) SBC was about to revert the lines due to Westex's failure to pay SBC's bills, resulting in cessation of Westex's operations, (2) Westex owed substantial back taxes, and (3) Hanley's partners at Westex were not contributing promised funding. Hanley created SRHC, LLC ("SRHC"), through which he would provide marketing and customer-related services to IQC.   CNB, IQC, and SRHC entered into agreements whereby Westex's lines were transferred to IQC, CNB provided SRHC with a line of credit, and SRHC would obtain a 49% ownership interest in IQC if certain productivity quotas were satisfied.[3]

During late March through early April 2004, Hanley transferred Westex's lines to IQC.   It is uncontroverted that Hanley never informed SecurityComm or NXS about the lines transfer.   Thereafter, NXS added, among other defendants, CNB and IQC to its suit against SecurityComm and Westex, alleging CNB and IQC violated UFTA by cooperating in the fraudulent transfer of Westex's lines.

During 2008, NXS's claims against CNB and IQC were severed.   In December 2008, NXS obtained a judgment ("2008 Judgment") against Westex for the remaining balance on the note and accrued interest plus attorney's fees and post-judgment interest. This court affirmed the 2008 Judgment.   *See SecurityComm Group, Inc. v. Brocail*, 14-09-00295, 2010 WL 5514333 (Tex. App.—Houston [14th Dist.] Dec. 28, 2010, pet. denied) (mem. op.).

---

[3] Ultimately, SRHC did not increase IQC's profits, and IQC sold its lines and entered bankruptcy.

3

In November 2010, a jury found in favor of NXS on its UFTA claims against CNB and IQC. As discussed in detail below, the trial court rendered judgment in 2011 (the "2011 Judgment") on the jury's verdict and awarded NXS as actual damages for its UFTA claim damages, attorney's fees, court costs, and post-judgment interest previously awarded in the 2008 Judgment; the trial court also awarded NXS attorney's fees incurred in prosecuting its UFTA claim.

## II. TEXAS UNIFORM FRAUDULENT TRANSFER ACT

UFTA is intended to prevent a debtor from defrauding its creditors by moving assets out of reach. *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776 (Tex. App.—Houston [14 Dist.] 2010, no pet.); *see also* Tex. Bus. & Com. Code Ann. §§ 24.001–.013 (West 2009) (UFTA). Numerous types of transactions are fraudulent for purposes of UFTA. *See* Tex. Bus. & Com. Code Ann. §§ 24.005, .006. Under UFTA, a defrauded creditor has several remedies, including avoidance of the transfer, temporary attachment of the transferred asset, and equitable remedies. *See id.* § 24.008. In certain circumstances, the creditor may obtain a monetary judgment against the transferee of the asset, the person for whose benefit the transfer was made, or subsequent transferees. *See id.* § 24.009(b). In any proceeding under UFTA, the trial court may award costs and reasonable attorney's fees that are equitable and just. *Id.* § 24.013.

## III. LEGAL AND FACTUAL SUFFICIENCY

In its first and second issues, CNB contends the evidence is legally and factually insufficient to support the jury's findings that (1) Westex transferred the lines, (2) the lines were owned by Westex, (3) the fraudulently transferred lines were worth $618,450 at the time of the transfer, (4) CNB was the first transferee of the lines, and (5) CNB is responsible for IQC's conduct. Additionally, in its third issue, CNB contends the jury's finding under Jury Question No. 5 that CNB did not "take the [lines] in good faith" is against the great weight and preponderance of the evidence. We address these arguments in turn.

4

## A.    Standard of review

To analyze the legal sufficiency of the evidence supporting a factual finding, we review the record in the light most favorable the finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not.  *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally insufficient only if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact.  *Id.* at 810.  On the other hand, a factfinder may not simply speculate that a particular inference arises from the evidence.  *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011).  If the evidence does no more than give rise to mere surmise or suspicion, it is no evidence.  *Id.*

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding.  *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998).  When a party challenges the factual sufficiency of the evidence supporting a finding for which the party did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.*; *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 748 (Tex. App.—Houston [14th Dist.] 2012, pet. filed).  When a party attacks the factual sufficiency of an adverse finding on which the party had the burden of proof, it must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.  *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).  The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony.  *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).  We may not substitute our own judgment for that of the trier of fact, even if we

would reach a different answer on the evidence. *Id* at 616. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Id.* If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

## B.    Whether Westex transferred the lines

In the first sub-point of issues one and two, CNB challenges sufficiency of the evidence supporting the jury's affirmative finding to Jury Question No. 1, "Did Westex fraudulently transfer assets?"  CNB argues no evidence supports the jury's finding because Hanley individually—not Westex—negotiated with IQC and CNB for the sale of the lines.

It is undisputed that SecurityComm purchased Westex on or around December 2003.  SecurityComm president Robert Strange testified that, following this sale, (1) SecurityComm had the sole authority to make decisions on behalf of Westex, (2) Hanley had no corporate authority to act on behalf of Westex, and (3) the board of SecurityComm never passed any resolution which provided Hanley authority to enter into negotiations with IQC.

Nevertheless, NXS presented a corporate resolution whereby SecurityComm, recognizing that "Westex has transferred and assigned certain customer telephone lines," "approved, adopted, ratified and confirmed in all respects" this transfer.[4]  Thus, not only did SecurityComm recognize in a corporate resolution that Westex, as opposed to Hanley, transferred the lines, but SecurityComm ratified the transfer.  Assuming this resolution does not prove as a matter of law that Westex transferred the lines, it is especially strong evidence of the fact.  Accordingly, we hold that the evidence is legally sufficient to

---

[4] In section IV., *infra*, we hold that the trial court did not err by admitting this resolution.

support the jury's finding that Westex transferred the lines. Furthermore, we hold that this finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

## C. Whether Westex owned the lines it transferred to IQC

Next, CNB contends the evidence is legally and factually insufficient to support the jury's finding under Jury Question No. 1 because Westex had no assets to transfer in March 2004.[5] CNB argues Westex had previously sold all of its assets—including its lines—to Thermo Credit, LLC ("Thermo Credit"). It is undisputed that, in December 2003, one of Strange's first actions as an officer of Westex was to enter into a factoring agreement with Thermo Credit (the "Factoring Agreement"). Thermo Credit vice president Jack Eumont testified that factoring "is the purchase of receivables and advancing funds relative thereto" and a receivable is "an amount due from a customer[,] a billing."

Explained concisely, under the Factoring Agreement, (1) Westex was required to periodically offer for sale certain accounts receivable to Thermo Credit, (2) Thermo Credit would then, in its sole discretion, select which accounts receivable it wanted and pay an "Advance Amount"[6] to Westex, (3) Thermo Credit owned the accounts receivable it purchased, and (4) Westex would collect payments on the accounts receivable and remit monies collected to a lockbox managed by Thermo Credit. Accordingly, under the Factoring Agreement, Thermo Credit owned any accounts receivable it purchased from Westex, but nothing in the agreement specified that Thermo Credit owned any of Westex's other assets, such as its lines. Therefore, we hold the evidence is legally sufficient to support the jury's implicit finding that Westex owned the lines it transferred to IQC.

---

[5] As part of this sub-point, CNB also contends Westex could not have fraudulently transferred the lines for purposes of UFTA because Thermo Credit had a lien on Westex's lines. Because CNB also raises this issue it its sub-point regarding valuation of the lines, we address it in that section. *See, infra*, section II.D.

[6] Succinctly, the "Advance Amount" was the amount of the account receivable less certain fees charged by Thermo Credit.

The evidence is also factually sufficient to support this finding. We acknowledge that Eumont provided contradictory testimony regarding Thermo Credit's ownership of Westex's assets. For example, Eumont testified that Thermo Credit owned only Westex's accounts receivable but also testified Thermo Credit owned all of Westex's telecommunications contracts and records, including, specifically, Westex's lines. Nevertheless, under the unambiguous language of the Factoring Agreement, Thermo Credit owned only the accounts receivable it purchased from Westex. Hence, we conclude the jury's implicit finding that Westex still owned the lines in March 2004 was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

## D. Value of the lines at the time of transfer

In Jury Question No. 2, the jury was asked, "What was the value of the assets transferred at the time of the transfer?" The jury answered $618,450. CNB contends the evidence is legally and factually insufficient to support this finding. CNB first argues that Westex did not own any lines at the time of the transfer because they were sold to Thermo Credit under the Factoring Agreement. We have already rejected this contention.

Next, CNB argues Westex did not have lines to transfer for purposes of UFTA because all of its lines were encumbered by a lien pursuant to the Factoring Agreement. Jury Question No 2. contained the following instruction: "You are instructed that the term 'Assets' means property of a Debtor, but the term does not include Property *to the extent it is encumbered by a valid lien*." (emphasis added). This instruction tracks the definition of "asset" in UFTA. *See* Tex. Bus. & Com. Code Ann. § 24.002(2)(A).

Under section 8.2 of the Factoring Agreement, Thermo Credit had a lien on many, if not all, of Westex's assets.[7] For purposes of this opinion, we will assume without

---

[7] Additionally, under section 2.5 of the factoring agreement, Thermo Credit had a conditional lien over certain Westex assets. However, neither section 2.5 nor section 8.2 support CNB's contention that Thermo Credit *owned* Westex's lines.

8

deciding that Thermo Credit had a valid lien on all of Westex's lines. According to CNB, the fact that Thermo Credit had a lien on Westex's lines means the jury had one rational choice: find that Westex did not transfer any assets.

However, under UFTA, Westex's assets do not include property "*to the extent* it is encumbered by a valid lien." *Id.* (emphasis added). The First Court of Appeals determined that, under the plain meaning of this language,[8] the value of property in excess of a valid lien encumbering the property is an "asset" as defined by UFTA. *Tel. Equip. Network, Inc. v. TA/Westchase Place Ltd.*, 80 S.W.3d 601, 610 n.6 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (citing several cases from other jurisdictions providing similar interpretation of UFTA); *see also Webster Indus., Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2d 821, 837 (N.D. Iowa 2004) (same). We agree and further note that it would be absurd to conclude the Legislature intended to permit debtors to avoid unsecured creditors by transferring property encumbered by a lien worth a fraction of the property's value.[9]

Consequently, we review the record for evidence regarding the value of Thermo Credit's lien. Eumont testified that, as of April 2004, Westex owed Thermo Credit $140,000 for previous advances, a $15,000 commitment fee, and a $60,000 termination fee, for a total of $215,000.[10] Accordingly, for purposes of this opinion, Westex's lines were an asset under UFTA to the extent they were worth more than $215,000 at the time of the transfer.

---

[8] We must interpret statutes in a manner that gives effect to the plain meaning of the statute's words and effectuates the Legislature's intent. *Young v. McKim*, 373 S.W.3d 776, 781 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

[9] CNB cites *Yokogawa Corp. of America v. Skye International Holding, Inc.*, for the proposition that property encumbered by a lien is not an asset for purposes of UFTA regardless of the amount of the lien. 159 S.W.3d 266 (Tex. App.—Dallas 2005, no pet.). The *Yokogawa* court did summarily conclude, "Because the property . . . purchased at the foreclosure sale was encumbered by a valid lien, [UFTA] is inapplicable." *Id.* at 269. However, the court did not discuss whether the value of the property exceeded the amount of the lien. Therefore, *Yokogawa* does not support CNB's position.

[10] At one point, Eumont testified Westex owed Thermo Credit approximately $290,000. However, the jury was free to disregard this number, particularly because the different amounts Eumont testified were owed equaled $215,000.

9

Finally, CNB argues that the jury's finding the value of the lines at the time of the transfer was $618,450 was arbitrary. CNB notes its valuation experts opined that Westex's lines were worth approximately $20 per line, which, multiplied by 8246 lines, supported a total value of almost $165,000. CNB also recognizes that NXS's valuation expert opined that the lines were worth approximately $288 per line, which, multiplied by 8246 lines, supported a total value of $2.3 million.[11] CNB argues the jury's $618,450 finding is not support by either party's valuation.

When a precise method for determining value is presented, the jury may not arbitrarily assess an amount that is not authorized or supported by the trial evidence; the jury may not "pull figures out of a hat." *See Enright v. Goodman Distrib., Inc.*, 330 S.W.3d 392, 403 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.). However, it is well-settled that, when the evidence supports a range of values, as opposed to two distinct options, a finding within that range is an appropriate exercise of the jury's discretion. *See Waterways on Intercoastal, Ltd. v. State*, 283 S.W.3d 36, 46 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex. App.—Houston [14th Dist.] 1996, writ denied). The jury is not required to explain why it awarded what it did, and its award will be upheld on appeal if the conclusion reached is within the range of evidence presented at trial. *A.H.D. Houston, Inc. v. City of Houston*, 316 S.W.3d 212, 219 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

The experts' valuations were simply educated opinions and not distinct, unassailable options—the experts were hypothesizing in November 2010 what the value of Westex's lines were in April 2004. *See, e.g.*, *271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*, No. 03-07-00498-CV, 2008 WL 2387630, at *8 (Tex. App.—Austin June 11, 2008, no pet.) (mem. op.) (concluding experts' divergent valuations regarding fair market value of truck provided range within which jury could find value); *see also Bayer*

---

[11] CNB does not argue that the evidence is insufficient to support NXS's expert's valuation.

*Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 609 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (explaining exact damages valuation in high-dollar commercial contract case "rarely possible and not required"). The experts generally agreed federal court decisions had negatively impacted the value of lines in the CLEC industry in the spring of 2004, and many uncertainties existed regarding the future of the industry. CNB vigorously cross-examined NXS's expert, revealing weaknesses regarding, *inter alia*, his comparables (e.g., his comparables largely involved CLECs which had their own telecommunications equipment, unlike Westex). Moreover, Hanley testified that, during 2004, McBride (one of CNB's valuation experts) offered to purchase Westex's lines for $50 to $100 each. Thus, the jury had a rational basis for finding the value of the lines was lower than that calculated by NXS's expert but higher than calculated by CNB's experts. *See Vela*, 203 S.W.3d at 51 (concluding jury could have reasonably reached its damages award by making reductions to plaintiff's expert's valuation based on flaws in the expert's calculations).

If we assume the jury found that Westex's lines were encumbered by a $215,000 lien and properly deducted this amount when determining the value of the transferred lines, the jury could have found the lines were worth $833,450, or approximately $101 per line; i.e., $833,450 less $215,000 equals $618,450. Accordingly, we hold the evidence is legally sufficient to support a finding that lines were worth $833,450—an amount closer in the value range to CNB's valuation of $165,000 than to NXS's valuation of $2.3 million. Further, we hold that this finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust.

**E.    Whether CNB was "the person for whose benefit the transfer was made"**

CNB next contends the evidence is legally and factually insufficient to support the jury's answers to Jury Question No. 3, as follows:

**Jury Question No. 3**

**Were any of the parties listed below the first transferee of the Assets or the person for whose benefit the transfer was made?**

. . .

a.   CNB      Yes

b.   IQC      Yes

This question tracks section 24.009(b), "The judgment may be entered against . . . the first transferee of the asset or the person for whose benefit the transfer was made." Tex. Bus. & Com. Code Ann. § 29.009(b).

The person for whose benefit the transfer was made may include the actual debtor or someone attempting to avoid a debt. *See, e.g.*, *Esse v. Empire Energy III*, *Ltd.*, 333 S.W.3d 166, 180–81 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding individuals were persons for whose benefit the transfer of assets was made because they were the majority shareholders of both the company fraudulently transferring the property and the company receiving the property); *Trigeant Holdings, Ltd. v. Jones*, 183 S.W.3d 717, 726 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("UFTA not only creates liability against 'the person for whose benefit the transfer was made,' *such as the debtor*, but also against 'the first transferee of the asset,' or any 'subsequent transferee.'" (emphasis added)). However, this does not foreclose the possibility that a person not directly involved with the debt sought to be avoided may be the person for whose benefit the transfer was made. We decline to interpret the language of section 24.009(b) to provide protection for beneficiaries of fraudulent transfers so long as they are not connected to the creditor's underlying claim.

Strong evidence supports a finding that CNB was a person for whose benefit the transfer was made: CNB owned, but was required to sell, IQC; and CNB approved the transfer of Westex's lines to IQC for the purpose of increasing IQC's value. The transfer directly benefited CNB because it increased the value of an entity owned by CNB and

12

which CNB needed to sell.  Accordingly, we hold the evidence is legally and factually sufficient to support the jury's finding pertaining to CNB under Question 3.[12]

## F.    CNB's Affirmative Defense

In its third issue, CNB contends the jury's finding under Jury Question No. 5 that CNB did not receive the lines in good faith is against the great weight and preponderance of the evidence.

Certain fraudulent transfers of assets under UFTA are not voidable against an entity that received the assets in good faith and for a reasonably equivalent value.  Tex. Bus. & Com. Code Ann. § 24.009(a).  Thus, good faith may be an affirmative defense to a fraudulent-transfer claim.  *Hahn v. Love*, 321 S.W.3d 517, 526 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  An entity invoking this affirmative defense bears the burden of establishing good faith.  *Id.*

The trial court submitted the following question and instruction relative to the CNB's good-faith defense:

**Jury Question No. 5**

**Did any of the parties listed below take the assets in good faith and for reasonably equivalent value?**

. . .

A transferee who takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not take the property in "good faith."

You are instructed that a Transferee acts in "good faith" if the Transferee lacks awareness of a Debtor's fraudulent intent in making the Transfer.

---

[12] In Jury Question Nos. 6 and 7, the jury was asked to determine whether CNB is responsible for IQC's conduct, i.e., disregard of corporate structures.  Because we affirm the jury's finding that CNB was the person for whose benefit the transfer was made, NXS is able to recover judgment against CNB regardless of its responsibility for IQC's conduct.  *See* Tex. Bus. & Com. Code Ann. § 24.009(b). Accordingly, we need not consider those portions of CNB's first and second issues in which it challenges sufficiency of the evidence supporting the jury's affirmative findings to Jury Question Nos. 6 and 7.

You are further instructed that notice of fraudulent intent can be either actual or constructive. Actual notice results from personal information or knowledge; constructive notice is notice the law imputes to a person not having personal information or knowledge.

. . .

a. CNB    <u>No</u>

b. IQC    <u>No</u>

Grosso (vice president of CNB and president of IQC) testified that he knew Westex needed to transfer the lines because "[b]ig bills hadn't been paid" to its creditors, including SBC, "Red River Networks," and "InTELEBill." Grosso further testified he did not think Westex had other creditors but admitted he never asked and was never told about the extent of Westex's liabilities. Singleton (president of CNB) testified that, at the time of the transfer, "[nobody] on [CNB's] side ever heard of [NXS] or the note it had from Westex." Nevertheless, Singleton testified he knew Westex was transferring the lines with the intent to avoid *at least one creditor*. This testimony provides ample support for finding that (1) CNB knew the transfer was fraudulent as to some creditors, and (2) CNB should have inquired further regarding the nature and extent of the fraud. Considering all of the evidence, we hold the jury's rejection of CNB's good-faith defense is not against the great weight and preponderance of the evidence.

Having disposed of all of CNB's sufficiency-of-the-evidence arguments regarding the jury's findings, we overrule issues one, two, and three.

## IV. TEXAS RULE OF EVIDENCE 408

In its fourth issue, CNB contends the trial court erred by admitting SecurityComm's corporate resolution, ratifying Hanley's lines transfer. Specifically, CNB argues this evidence should not have been admitted because CNB ratified the transfer as part of a

14

settlement agreement among (1) SecurityComm, Westex, and Strange, (2) CNB and IQC, and (3) Hanley, Westex Marketing, and SRHC.[13]

"Evidence of (1) furnishing or offering or promising to furnish or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount." Tex. R. Evid. 408. "Evidence of conduct or statements made in compromise negotiations is likewise not admissible." *Id.* Rule 408 "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice or interest of a witness or a party, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." *Id.* The objecting party bears the burden of proving the evidence is not offered for a valid purpose permitted under Rule 408. *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 61 (Tex. App.—San Antonio 2005, pet. denied). We review the trial court's ruling regarding Rule 408 for an abuse of discretion. *Id.*

NXS presented a June 2004 corporation resolution whereby SecurityComm ratified Westex's lines transfer, effective March 15, 2004 (before the lines were transferred). It is undisputed SecurityComm made this resolution in connection with a confidential settlement agreement; Strange testified he signed the resolution in an attempt to "get [SecurityComm] out of this situation." However, the trial court overruled CNB's Rule 408 objection, explaining, "Well, it's clearly intended to have some independent significance or it wouldn't be a corporate resolution. So falling back on that it's a settlement thing, isn't by itself going to [establish inadmissability]."

We hold that the trial court acted within its discretion by admitting the resolution. Rule 408 precludes admission of "[e]vidence of . . . furnishing . . . a valuable consideration

---

[13] Apparently, NXS was urged to participate in these settlement negotiations but declined.

15

in compromising . . . a claim . . . to prove liability for or invalidity of the claim." Tex. R. Evid. 408. NXS did not present evidence of SecurityComm's furnishing a corporate resolution in compromising a claim; all references to settlement negotiations were redacted in the version of the corporate resolution admitted at trial.[14] As the trial court noted, NXS was simply presenting evidence that SecurityComm had ratified the lines transfer—a purpose distinct from the issue of whether SecurityComm was conceding liability by furnishing consideration. Furthermore, nothing in the resolution limits SecurityComm's ratification of the lines transfer—apparently, the lines transfer was ratified for all intents and purposes and in relation to all individuals and entities, including Westex's creditors such as NXS. Accordingly, we overrule CNB's fourth issue.

## V. ATTORNEY'S FEES

In the first part of its fifth issue, CNB contends the trial court erred by awarding NXS $587,550 in attorney's fees because NXS did not properly segregate between recoverable and unrecoverable fees.

"In any proceeding under [UFTA], the court may award costs and reasonable attorney's fees as are equitable and just." Tex. Bus. & Com. Code Ann. § 24.013. Section 24.013 gives the trial court the sound discretion to award attorney's fees based on the evidence the court heard. *Walker v. Anderson*, 232 S.W.3d 899, 919 (Tex. App.—Dallas 2007, no pet.).

If any attorney's fees relate solely to claims for which fees are not recoverable, a claimant must segregate recoverable from unrecoverable fees. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Intertwined facts do not make all attorney's fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined they need not be segregated. *Id.* at 313–14. Attorneys are not required to keep separate records documenting the exact

---

[14] Nevertheless, on cross-examination of Strange, CNB elicited testimony that SecurityComm adopted the resolution for the sole purpose of compromise and settlement.

16

amount of time working on one recoverable claim versus an unrecoverable claim. *See id.* at 314; *CA Partners v. Spears*, 274 S.W.3d 51, 82 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Rather, segregation is sufficiently established if, for example, an attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorney's fees are unrecoverable had not been asserted. *Chapa*, 212 S.W.3d at 314; *Spears*, 274 S.W.3d at 82.

CNB argues NXS did not adequately segregate fees by claims or by parties. During the hearing on NXS's claim for attorney's fees, the trial court admitted redacted invoices of NXS's attorneys, which reflected unsegregated legal fees and expenses incurred by NXS from February 2004 to November 2010. Brian Casey, counsel for NXS, admitted he did not have a spreadsheet demonstrating what percentages he assigned each month and that it is not possible to review the invoices to determine how fees were segregated.

Nevertheless, Casey testified that the total amount of attorney's fees incurred from February 2004 through the November 2010 trial was roughly $1.5 million, from which, after discounting and segregating, NXS was requesting $983,500 as attorney's fees in its UFTA case. Accordingly, Casey attributed approximately 66% of NXS's fees to the UFTA case. Casey testified that he reviewed every entry on every invoice and deducted any amount that did not pertain to the "core part" of NXS's UFTA claim, fees uniquely related to former co-plaintiffs who had been non-suited, and $180,000 incurred in prosecuting the 2008 Judgment. Casey explained,

> [For] every month['s invoice,] I'm doing a detailed review. I'm not just kind of guessing. I went back and looked at the file, looked at the pleadings and the correspondence and I looked at the entries, of course, to the extent I could decipher them and I allocated based upon that. So every month I'm doing that, and if there's discrete items that I know, discrete entries from the description that I know are not recoverable, I'm taking that out in the beginning before I start doing percentages of allocation. So that allocation, the percentage is on top of that, it gets moved up inside of that. But I'm doing it in my mind and in my head separately.

17

Casey further testified that UFTA issues dominated the legal work performed for NXS because Westex and SecurityComm were insolvent and, thus, NXS could recover only on a fraudulent-transfer theory.

During cross-examination, Casey was challenged regarding his segregation relative to certain claims and parties. Casey testified he did not request fees uniquely related to former co-plaintiffs who were non-suited and the previous suit against Westex and SecurityComm. Casey stated he deducted an entire deposition of Strange because it related to a former co-plaintiff and also deducted unique entries related to a defendant attorney (Joe DiCecco) and a defendant employee of Westex Marketing (Wesley Jaynes). When asked about segregation of fees related to Hanley, SRHC, and Westex Marketing, Casey said he deducted those fees if they involved settling claims—but Casey reiterated how crucial facts and law surrounding Hanley were to the UFTA claims against CNB.[15]

Accordingly, Casey testified that he segregated fees by case and party and, when cross-examined, explained how he determined claim- and party-specific allocations. We hold that the foregoing testimony supports a conclusion that NXS properly and adequately segregated attorney's fees by claim and party under the relaxed standard enunciated in *Chapa*. *See* 212 S.W.3d at 314 & n.83. We overrule that portion of CNB's fifth issue pertaining to segregation of attorney's fees.

## VI.   ERROR IN THE 2011 JUDGMENT

In its sixth issue and the second part of its fifth issue, CNB argues the trial court erred by awarding in the 2011 Judgment attorney's fees and court costs previously awarded to NXS in the 2008 Judgment. Specifically, the 2011 Judgment includes, *inter alia*, the following awards:

---

[15] We note that CNB also presented a witness who testified regarding which parties and claims should have been wholly segregated from NXS's fees calculation. The trial court was free to disregard such testimony.

[(c)] Interest awarded in the [2008 Judgment] against [Westex] on the amount of $150,642.00 (attorney's fees) from December 30, 2008 through the date of this judgment at the annual rate of 18%, compounded annually;

[(d)] The sum of $50,000.00 awarded in the [2008 Judgment] against [Westex] as appellate attorney's fees;

[(e)] Interest on the sum of $50,000 from April 1, 2009 through the date of this judgment at the annual rate of eighteen percent (18%), compounded annually;[16]

. . .

[(g)] Taxable Court Costs incurred in prosecuting this matter and in prosecuting [the 2008 Judgment against Westex];

. . .

[(k)] Post-Judgment interest on all amounts (damages, interest, attorney's fees and costs) awarded in this judgment at the annual rate of five percent (5%), compounded annually[.]

CNB argues that under UFTA, the trial court should not have awarded NXS the following amounts previously awarded in the 2008 Judgment: attorney's fees; interest on fees; and court costs.

Relatedly, in its cross-appeal, NXS contends the trial court erred by not awarding NXS (1) interest of 18% on the $50,000 in appellate attorney's fees awarded in the 2008 Judgment (see item (d) in the preceding paragraph)[17] and (2) post-judgment interest of 18% on all amounts awarded from the 2008 Judgment (see item (k) in the preceding paragraph). According to NXS, the aggregate amount of damages, attorney's fees, and court costs awarded in the 2008 Judgment is the amount of its UFTA claim against CNB. Apparently, at one point, the trial court agreed with this argument because it granted NXS's motion for summary judgment, concluding, "The amount necessary to satisfy [NXS's] claim as a creditor of Westex is the recovery awarded to [NXS] in the [2008

---

[16] The trial court drew a line through item (e), thus denying NXS's request for interest on appellate attorney's fees incurred defending the 2008 Judgment.

[17] NXS is entitled to these appellate attorney's fees because Westex did not prevail in its appeal of the 2008 Judgment.

19

Judgment.]" However, both parties recognize that the trial court was free to modify its summary judgment while the court had plenary power. *See Fabio v. Ertel*, 226 S.W.3d 557, 562 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("A trial court may change or modify a partial summary judgment at any time before its plenary power expires because it is an interlocutory order.").[18]

Resolution of these issues requires us to consider what type of damages UFTA affords. "Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under Section 24.008(a)(1) of this code, the creditor may recover judgment for the value of the asset transferred . . . or the amount necessary to satisfy the creditor's claim, whichever is less." Tex. Bus. & Com. Code Ann. § 24.009(b). "The judgment may be entered against: (1) the first transferee of the asset or the person for whose benefit the transfer was made; or (2) any subsequent transferee other than a good faith transferee[.]" *Id.* The parties agree that the jury's valuation of the lines transferred ($618,450) is greater than the amount necessary to satisfy NXS's claim. Thus, NXS's judgment must be for the amount necessary to satisfy its claim.

Under UFTA, "claim" means "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3). NXS argues the amount of its "claim" was determined in the 2008 Judgment against Westex, and includes, not only the amount awarded on the note, but attorney's fees, court costs, and post-judgment interest of 18% on all amounts awarded in the 2008 Judgment.

---

[18] Nevertheless, NXS argues that res judicata and collateral estoppel prevent relitigation of the amount of its UFTA claim. We disagree. Res judicata does not apply because NXS's breach-of-contract case against Westex did not involve Westex's fraudulent transfer of assets to IQC and CNB. *See Walker*, 232 S.W.3d at 912–13 (holding UFTA claim not barred by res judicata because not based on same operative facts as fraud claim resolved in previous action). Further, collateral estoppel does not apply to prevent us from determining the scope of NXS's UFTA claim, an issue not considered in NXS's case against Westex. *See Sysco Food Servs., Inc. v. Trapnell*, 890 S.W.2d 796, 801 (Tex. 1994) (explaining collateral estoppel applies when issue sought to be litigated was already fully litigated in previous action).

First, we recognize the uniqueness of our procedural posture. Westex defaulted, and was sued by NXS, on the note before the fraudulent transfer occurred in late March and early April 2004. Subsequently, NXS brought CNB into the lawsuit, alleging fraudulent transfer under UFTA. In 2008, *at CNB's request,* the trial court severed NXS's claims against CNB from NXS's claim against Westex. In December 2008, NXS obtained the 2008 Judgment against Westex. More than two years later, NXS obtained the 2011 Judgment against CNB. Generally, a creditor will not proceed to judgment against a debtor following a fraudulent transfer because the debtor has become insolvent—hence, the reason for allowing the creditor to seek relief against the transferee under UFTA. Therefore, the protracted nature of this case is unlikely to recur. Nevertheless, we acknowledge the issues determined in the suit against Westex—such as that NXS was a creditor of Westex, and the amount owed on the note—were issues NXS would have had to prove in its UFTA case. Thus, the 2008 Judgment against Westex cannot be said to be superfluous in the instant case. Moreover CNB's request for a severance is the primary reason for the piecemeal litigation. With this background in mind, we consider the parties' contentions regarding the scope of NXS's UFTA claim.

Under the UFTA definition of "claim," a "right to payment" clearly includes NXS's right to payment of past-due principal and accrued interest on the defaulted note. Further, the note contains the following attorney's fees provision:

> If this Note is collected by suit, through probate or bankruptcy court, or by other judicial proceedings, or if this Note is not paid at maturity, howsoever such maturity may be brought about, and is placed in the hands of an attorney for collection or enforcement, then [Westex] promises to pay reasonable attorney's fees, in addition to all other amounts owing hereunder.

It is undisputed that NXS sued Westex on the mature note in February 2004—two months before the fraudulent transfer occurred. We hold that, under these unique circumstances, NXS had a "right to payment" of reasonable attorney's fees incurred in

21

establishing the collectability of the note. [19]  In effect, NXS and Westex agreed attorney's fees would be contractual damages in the event of default—damages Westex may have sought to avoid by transferring the lines.  We also conclude this right to payment includes appellate attorney's fees NXS incurred successfully defending Westex's appeal of the 2008 Judgment.

CNB's cites two cases for the proposition that the amount necessary to satisfy the creditor's claim based on a defaulted note is limited to the balance due on the note.  *See Patel v. Kuciemba*, 82 S.W.3d 589, 599 (Tex. App.—Corpus Christi 2002, pet. denied) (explaining theoretical maximum amount of UFTA claim based on defaulted note would be actual amount due on note); *Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 934 (Tex. App.—Houston [1st Dist.] 1993, no writ) (concluding amount due on note plus accrued interest were proper damages under UFTA).  However, these cases are inapposite because neither involves the situation in which a promise to pay attorney's fees is part of the note.

CNB also argues the amount of a creditor's claim must be limited to the amount owed at the time of the fraudulent transfer because UFTA penalizes debtors who transfer assets when a "creditor's claim arose before or within a reasonable time after the transfer." *See* Tex. Bus. & Com. Code Ann. §§ 24.005, .006.  CNB further notes that, under 24.009(b), if a money judgment "is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require."  *Id.* § 24.009(c).  According to CNB, this means the amount necessary to satisfy the creditor's claim also should be calculated as of the time of the transfer.

We disagree.  Although there is a temporal limitation when a monetary judgment is based on the value of the asset transferred, no such limitation applies when the judgment is

---

[19] We express no opinion regarding whether a "claim" under UFTA includes statutory attorney's fees, such as those authorized under chapter 38 of the Civil Practice and Remedies Code.

based on the amount necessary to satisfy the creditor's claim. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) ("The qualifying language in [Illinois UFTA], which mandates a valuation of an asset at the time of transfer if the calculation 'is based on the value of the asset,' does not apply if 'the amount necessary to satisfy the creditor's claim' is the proper benchmark, as it was here."); *United States v. Spencer*, No. 10-CV-229-TCK-PJC, 2012 WL 4577927, at *11 (N.D. Okla. Oct. 2, 2012) (slip op.) (concluding "amount necessary to satisfy the creditor's claim" is not set at the time of transfer, explaining, "[i]t is only the first number—the value of the asset transferred—that is given a time-of-transfer value"). NXS was entitled to recover the amount necessary to satisfy its claim—a claim which includes contracted-for attorney's fees. CNB, whom the jury found participated in the fraudulent transfer of the lines, should not be insulated from liability for attorney's fees simply because most of the fees were incurred after the transfer. Indeed, when a debtor fraudulently transfers assets, his intent will often be to avoid not only the amount then due on the creditor's claim but any debt continuing to accrue.

Nevertheless, we decline to hold that, under these unique circumstances, court costs awarded in the 2008 Judgment and post-judgment interest on attorney's fees awarded in the 2008 Judgment come within the meaning of "claim" as defined in section 24.002(3). There is nothing in UFTA supporting a conclusion that the Legislature intended "claim" to include every incidental expense associated with the creditor's underlying "right to payment."[20] By transferring the lines, Westex avoided paying NXS's contractual claim on the defaulted note for past-due principal and accrued interest and reasonable attorney's fees—not court costs and post-judgment interest on attorney's fees awarded years later in the 2008 Judgment.

---

[20] Again, we emphasize the limited nature of our holding: we express no opinion regarding whether court costs or post-judgment interest on attorney's fees are included in a creditor's UFTA claim when the costs and interest were previously awarded in a judgment, and the debtor fraudulently transferred assets in an attempt to avoid that judgment.

Accordingly, our holding relative to the parties' judgment-related issues, and our modification of the 2011 Judgment, is as follows:

- We sustain CNB's request to strike from the 2011 Judgment the trial court's award of "[i]nterest awarded in the [2008 Judgment] against [Westex] on the amount of $150,642.00 (attorney's fees) from December 30, 2008 through the date of this judgment" (see item (c), *supra*). We strike this portion of the judgment.

- We overrule NXS's contention that the trial court should have awarded NXS post-judgment interest on its $50,000 in appellate attorney's fees incurred defending the 2008 Judgment (see item (e), *supra*).

- We sustain CNB's request to strike from the 2011 Judgment the trial court's award of court costs "incurred . . . in prosecuting [the 2008 Judgment]" (see item (g), *supra*). We strike this portion of the judgment.

- Finally, we address NXS's contention that post-judgment interest on amounts based on the 2008 Judgment awarded in the 2011 Judgment should be set at 18% (see item (k), *supra*). Under the Finance Code, a money judgment *on a contract* that provides a specific interest rate earns post-judgment interest at the lesser of the rate specified in the contract or 18%. Tex. Fin. Code Ann. § 304.002 (West 2006). All other money judgments earn post-judgment interest at a statutorily prescribed rate, which, in the instant case, is 5%. *Id.* § 304.003 (West 2006); *see also Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.*, 333 S.W.3d 719, 734–35 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). NXS's money judgment is not "on a contract" but under UFTA. Therefore, the trial court correctly set the post-judgment interest rate on all amounts awarded at 5%.

Thus, we (1) overrule the second part of CNB's fifth issue relating to the inclusion in the 2011 Judgment of attorney's fees awarded in the 2008 Judgment, (2) sustain CNB's sixth issue pertaining to modification of the 2011 Judgment, and (3) overrule the sole issue raised by NXS in its cross-appeal.

We affirm the 2011 Judgment as modified.

Charles W. Seymore
Justice

Panel consists of Chief Justice Hedges and Justices Seymore and Brown.

24