**Affirmed and Opinion filed June 30, 2016.**



In the

# Fourteenth Court of Appeals

## NO. 14-15-00093-CV

### STATE FARM LLOYDS, Appellant

### V.

### GINGER HANSON, Appellee

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-68087**

## O P I N I O N

State Farm Lloyds appeals from a judgment in favor of insured Ginger Hanson following a jury trial. The jury found that State Farm breached its policy when it refused to cover physical loss to Hanson's roof caused by a wind event in June 2012. In addition to awarding Hanson damages for the cost to repair or replace her physical loss, the jury awarded attorney's fees. State Farm: (1) challenges the legal sufficiency of the evidence supporting the jury's finding that

State Farm failed to comply with the policy, (2) contends that the evidence conclusively established an exclusion to coverage, and (3) argues that Hanson failed to produce evidence showing she was entitled to replacement cost benefits. With regard to attorney's fees, State Farm argues that: (a) the evidence is legally insufficient to support the award; (b) under rule 167, State Farm is entitled to an offset for litigation costs accruing after Hanson rejected its settlement offer and Hanson is precluded from receiving post-rejection attorney's fees; (c) Hanson failed to properly segregate; and (d) the award is excessive. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ginger Hanson closed on the house at issue in July 2011. At the time, the roof was approximately 15 years old with 30-year shingles fastened to the decking with staples. The house underwent a purchase inspection, which did not reveal any concerns with the roof. The seller's disclosure did not indicate any roof damage.

Hanson sought coverage for the house from her longtime State Farm agent. Her agent prepared an underwriting report for Hanson's policy. There was no indication that the roof had "possible hail damage," "curled shingles," "loose/missing shingles," "wear in valleys," "missing/replaced ridge row," "patched area[s]," or "stain/rotting under eaves." There were no "interior leaks." The report did not identify any possible concerns. According to Shannon Kimmel, one of Hanson's experts with experience working as a claims adjuster for State Farm and currently working as a public adjuster,[1] the underwriting report indicated there were "no issues with that roof less than a year before this reported storm." Another of Hanson's experts with experience working for State Farm as a claims adjuster, Kerry Freeman, stated that the report reflected a "clean bill of health" for

---

[1] A public adjuster is an adjuster who is licensed to represent the public against an insurance company when there is a problem with the claim.

Hanson's roof.

Under "Section I – Coverages," Hanson's homeowner's policy with State Farm provides:

COVERAGE A – DWELLING

1. Dwelling. We cover the dwelling used principally as a private residence on the residence premises shown in the Declarations.

Dwelling includes:

a. structures attached to the dwelling;

b. materials and supplies located on or adjacent to the residence premises for use in the construction, alteration or repair of the dwelling or other structures on the residence premises;

c. foundation, floor slab and footings supporting the dwelling; and

d. wall-to-wall carpeting attached to the dwelling.

Under "Section I – Losses Insured," the policy provides:

COVERAGE A – DWELLING

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in SECTION I - LOSSES NOT INSURED.

Under "Section I – Losses Not Insured," the policy provides:

1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these: . . .

g. wear, tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown . . . .

3. We do not insure under any coverage for any loss consisting of one or more of the items below. Further, we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of

3

whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss: . . .

    b. defect, weakness, inadequacy, fault or unsoundness in: . . .

        (2) design, specifications, workmanship, construction, grading, compaction . . . .

Hanson was not at home during the June 1, 2012 storm. On the day after the storm, Roy Campbell, who sells roofs for Telge Roofing, tarped roofs and made adjuster appointments for houses in Hanson's neighborhood. Kimmel discussed the June 1, 2012 storm with Hanson's neighbors and the greenskeeper for the golf course around the corner from Hanson's house. After the storm, the golf course had to shut down due to "a tremendous amount" of fallen trees blocking golf cart paths. Several of Hanson's neighbors received new roofs after the June 1, 2012 storm.

In early October 2012, Campbell inspected Hanson's roof. Campbell found "pulled through fasteners" and "lots of wind lift": "Basically, [Hanson] has staples on her roof and where the wind had lifted it up, it made a clean pull through of the shingle. The shingle was actually still in place but it's basically flapping in the wind." Campbell found areas of Hanson's roof where the edges of the top layer of shingles were not sealed to the underlying layers and could be lifted by hand. Campbell suggested that Hanson file an insurance claim.

Hanson and Campbell called in a claim to State Farm for wind damage to Hanson's roof.[2] State Farm assigned claims representative Jon Flores. Campbell accompanied Flores onto the roof for the inspection. Campbell showed Flores areas of pulled-through shingles and creased shingles. Flores only walked the

---

    [2] Hanson's claim initially also included hail damage.

4

ridge[3] of the roof and did not go down any of the slopes. According to Campbell, Flores indicated there was not "enough damage" and that despite any "lift" there were "no missing shingles." Flores concluded that Hanson's roof had not sustained an accidental direct physical loss.

Flores's inspection did not satisfy Hanson. Campbell referred Hanson to Kimmel. Hanson requested another inspection from State Farm. State Farm next assigned claims representative Andrew Traise. Campbell accompanied Traise onto the roof for the inspection. Kimmel also was present. Campbell described Traise's inspection as uncharacteristically quick. Traise "traversed" about ten percent of the roof and made no effort to ask any of Hanson's neighbors about, or to observe, their properties. Campbell showed Traise areas of lifted shingles "pretty much all over the roof"—pulled-through fasteners and unsealed shingles. According to Campbell, Traise wanted to find "some more missing shingles, you know, damaged shingles." Traise informed Hanson that he found no accidental direct physical loss. State Farm denied Hanson's claim for wind damage.

In November 2012, Hanson filed suit against State Farm and Traise. Against State Farm, Hanson alleged breach of contract and violation of the Prompt Payment of Claims Statute, *see* Tex. Ins. Code Ann. §§ 542.051–.061 (West 2009). Against both State Farm and Traise, Hanson alleged "bad faith/DTPA" in the form of violations of chapter 541 of the Insurance Code, *see id.* §§ 541.051, 541.060, 541.061 (West 2009).[4] State Farm and Traise served Hanson with a settlement offer in November 2013. State Farm and Traise offered Hanson $30,000, with an

---

[3] The ridge is the top of the roof, where the slopes intersect.

[4] In May 2014, the trial court granted partial summary judgment in favor of State Farm on the "section 542 claims and common law duty of good faith and fair dealing." The trial court also granted partial summary judgment in favor of Traise on "any common law duty of good faith causes of action."

5

expiration date of December 4, 2013. Hanson did not accept the offer.

At trial, Kimmel testified about his inspection of Hanson's roof. He described accidental direct physical loss as "any damage to the shingle. It could be creasing. It could be torn. In this instance, in her roof, it's pulled through that fastener so it's actually torn right there at the fastener. So it is damage, it's got actual direct physical loss." Kimmel located pulled-through shingle damage, where a shingle is "pulled through that fastener so it's actually torn right there at the fastener," exposing the plywood decking underneath. According to Kimmel, pulled-through shingles indicate "wind damage" and comprise "accidental direct physical loss" covered under Hanson's policy. Kimmel also located "wind-creased" shingle damage, where the shingle "was actually bent over" because "the wind has been flapping that thing up and creased it." Wind-creased shingles also are "accidental direct physical loss" covered by Hanson's policy. Kimmel further found shingle damage caused either by flying debris or "tree damage where the tree's blown into the roof during the storm and messed up the edging." He indicated that such damage was covered by Hanson's policy. According to Kimmel, Hanson's roof "absolutely" sustained covered wind damage on "all sides." He opined Hanson's roof required replacement—there were "way too many shingles that are damaged on the roof, and the cost of repairing that would outweigh the cost of replacing that."

Freeman also inspected Hanson's roof and agreed with Kimmel's assessment of wind damage. Freeman described pulled-through shingle damage—"[w]hat that is, where that fastener originally was put into that top one, it has been pulled up and torn from wind." Freeman acknowledged that he saw a "handful" of overdriven staples, as there are on any given roof, but that he saw pulled-through shingle tears throughout Hanson's roof. He stated that if the staples had been

6

overdriven, then there would not be tearing; instead, "it would go straight through like a bullet hole." Freeman opined that the roof was unrepairable because the repairs would risk causing more damage to the shingles. Freeman further testified regarding his Xactimate[5] estimate totaling approximately $39,687 as the reasonable and necessary cost to replace Hanson's roof.

State Farm's expert Mark West, a general contractor, inspected Hanson's roof with Eric Green, a civil engineer also serving as State Farm's expert. West did not walk the back slope of Hanson's roof. West acknowledged that "potentially the ridge was displaced by wind." There were approximately five to ten "displaced shingle tabs" and shingle tabs with a tear, crease, or "stripe," which could have been damaged by a wind event or from impact with tree limbs. West agreed that a windstorm could cause shingles to unseal or pull through their fasteners. He opined that the damaged shingle tabs could be repaired for under $500. West, who has experience with Xactimate, went through Kimmel's estimate and noted several areas of unnecessary and duplicative charges. West estimated that the cost to replace Hanson's roof was approximately $15,000 to $16,000.

According to Green, wind measurements from the closest airport to Hanson's house (approximately eight miles away) indicated gusts up to 49 mph on June 1, 2012. This wind speed can blow over small trees and cause tree branches to fall. Green testified that wind can cause physical damage to roofs such as shingles ripping off, tearing, and creasing. He physically examined a "sampling" of about five to eight percent of the surface of Hanson's roof. Green acknowledged finding some shingles on the ridge and on the eaves that had sustained wind damage or "wind-blown debris damage." Also, "wind forces"

---

[5] Xactimate is software widely used in the insurance industry to estimate a cost basis for property replacement, including roofs.

possibly contributed to some staple failures. Green agreed that Kimmel's photos revealed "conditions consistent with wind damage." When asked whether there was wind damage to Hanson's roof, Green answered "yes." Green indicated that the damaged shingles could be replaced without replacing the entire roof and could be repaired for less than the policy's $4000 deductible. Green opined that the unsealed condition of Hanson's roof was not caused by a wind event, but rather by thermal expansion and contraction. Although Green stated Hanson's roof was in "excellent" condition and was "aging extremely well," he also opined it was a "bad roof" that had been defectively installed because 80 to 85 percent of the staples had been overdriven. Green also stated it was "true" that Hanson's roof needed to be replaced.

One of Hanson's trial counsel, Richard Daly, testified regarding attorney's fees. He described the case as "difficult," involving as many as fifteen raised defenses, at least five depositions, discovery disputes, legal challenges, and multiple experts on each side. Daly described his firm's method of keeping time records in a certain computer program. The trial court admitted a summary containing billing entries in Hanson's case from October 22, 2012 through May 15, 2014. The summary contains line items with information about the date, the billing professional, description of tasks performed, the hours and rate, and the amount. The summary totaled just over $157,000. Daly described the work spent on Hanson's contract and bad faith claims as inextricably intertwined and estimated that five percent of the time was spent solely on bad faith issues. Daly testified that attorney's fees of $149,224.11 were fair, reasonable, and necessary.

State Farm's expert on attorney's fees, Charles Levy, opined that Hanson's case was "a plain run-of-the-mill lawsuit" and could have been tried for fewer hours at lower rates for approximately $30,000 to $40,000.

Question 1 of the jury charge asked whether State Farm failed to comply with the terms of the insurance policy issued to Hanson. The jury was instructed that: the insurance policy covers physical loss to Hanson's property caused by a June 1, 2012 wind event; the policy does not cover wear and tear, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown; and the policy does not cover defect, weakness, inadequacy, fault or unsoundness in design, specifications, workmanship, construction, grading, compaction, materials used in construction or repair, or maintenance. The jury answered "yes" to question 1.

Question 2 asked the jury what sum of money would fairly and reasonably compensate Hanson for her damages resulting from State Farm's failure to comply with the policy. The jury awarded $12,878 as "the cost to repair or replace any physical loss to Ginger Hanson's property as a result of a wind event on June 1, 2012, less the deductible of $4,000."

Question 3 asked the jury what is a reasonable fee for the necessary services of Hanson's attorneys in the current lawsuit. For representation prior to and through trial, the jury awarded $70,000. The jury awarded $45,000 for representation in an appeal in the court of appeals, and a total of $35,000 for representation in the Supreme Court of Texas. For representation before the settlement offer's deadline, the jury awarded $15,000.

The trial court rendered final judgment in favor of Hanson and against State Farm consistent with the jury's verdict, and rendered that Hanson recover nothing from Traise. State Farm timely appealed.

9

## II. ANALYSIS

## A. State Farm's first issue

In what we construe as its first issue, State Farm presents three distinct subparts. First, State Farm contends there is no proof that Hanson's roof sustained a covered physical loss on June 1, 2012. Second, State Farm asserts any physical loss was not covered because it conclusively established that an exclusion applied. Third, State Farm argues that Hanson cannot recover replacement costs as damages because she did not prove she was entitled to them.

### 1. Standard of review

The test for legal sufficiency is whether the evidence at trial "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we must view the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 827. We assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregarded all other inferences. *Id.* at 821. We cannot substitute our judgment for that of the jury, so long as the evidence falls within the zone of reasonable disagreement. *Id.* at 822. The factfinder is the only judge of witness credibility and the weight to give to testimony. *Id.* at 819.

We will sustain a legal sufficiency challenge only when: (1) the record discloses the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810.

10

More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller*, 168 S.W.3d at 816. To successfully challenge the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, a party must conclusively establish all vital facts in support of that issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

## 2. Legally sufficient evidence supports the jury's answer to question 1.

State Farm first argues Hanson did not prove that her shingles were in a "satisfactory state," or sealed, before the June 1, 2012 storm.[6] State Farm points to Hanson's testimony that she did not ask her inspector to check for unsealed shingles when she purchased the house, and did not know whether they were sealed in 2011 or whether any other weather event had affected the sealing.

The evidence presented, however, reasonably supports the jury's finding that Hanson's shingles were sealed prior to June 1, 2012. The inspection of Hanson's house prior to closing found only cosmetic issues, no substantive damage, "nothing really wrong with the roof that required repair." The seller's disclosure did not indicate any roof damage. State Farm generated an underwriting report in June 2011 to determine whether to issue a policy on Hanson's house. The report indicated that there were no concerns regarding the roof—no hail damage, no

---

[6] State Farm cites *Lennar Corp. v. Great American Insurance Co.*, 200 S.W.3d 651, 678–79 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), *abrogated by Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010). However, unlike here, the circumstances in *Lennar* revealed that the exterior insulation and finish system at issue had not been physically injured or changed to constitute property damage, but rather was "already in an unsatisfactory state when applied to the homes because it is inherently defective." *Id.* at 679.

11

curled shingles, no loose or missing shingles, no valley wear, no missing or replaced ridge row, no patched areas, no stain or rotting under the eaves, and no interior leaks.  Kimmel's and Freeman's testimony supports that State Farm found no issues in 2011 precluding roof coverage.  State Farm's corporate representative, Randy Teufel, the team manager who supervised both Flores and Traise, testified the report showed that Hanson's roof was in "good condition."  Traise also testified that the report indicated "no problems noted with the roof."

State Farm also argues there is no evidence that a wind event caused the unsealed condition of Hanson's roof.  State Farm contends that Campbell and Kimmel did not testify regarding what caused the sealant to fail, only that the wind lifted the shingles so that they pulled and tore through the staples.  However, State Farm's expert Green, when asked "what are the scientifically recognized causes of unsealed shingles," testified that shingles "can become loose because of wind" and agreed "wind can cause sealant failure."  West agreed that a windstorm could cause shingles to "flap in the wind."  In any event, the evidence was not limited to unsealed shingles, or even pulled-through shingles.  Even assuming without deciding solely for purposes of our analysis that purely unsealed shingles are not evidence of accidental direct physical loss due to wind, there is no dispute that "torn, ripped, folded, creased," "missing," or "displaced" shingles can constitute evidence of accidental direct physical loss due to wind.  Campbell indicated that Traise wanted to find "more missing shingles"; in other words, Traise located some missing shingles.  Kimmel located "wind-creased" shingle damage and areas of "messed-up" edging caused by flying debris or by a tree "blown into the roof during the storm."  Freeman saw the same damage as Kimmel.  West observed "displaced" shingle tabs. He agreed that photos taken by Kimmel showed shingle tabs with tears and creases.  Green located a missing ridge shingle and "wind-

12

blown debris damage" on eave shingles.  Green also agreed that Kimmel's photos showed creased shingles.  This evidence is legally sufficient to support the jury's finding of physical loss.

Next, State Farm asserts Hanson produced no evidence that a wind event caused pulled-through damage to the shingles.  State Farm argues that Campbell's and Kimmel's expert testimony was not probative because it is conclusory or speculative.[7]  State Farm essentially contends that Campbell's and Kimmel's opinions amount to no evidence because they did not adequately explain or link their opinions to the facts.[8]  State Farm also complains that Campbell and Kimmel did not rule out alternate causes of the purported pulled-through shingle damage.[9]  State Farm contends that the pulled-through shingle damage was instead caused by a construction defect: overdriven staples.  Again, setting aside the pulled-through shingles,[10] State Farm's position completely fails to recognize that the jury was presented with evidence of other types of shingle damage—such as creases, "stripes," edging tears, and displacement—which Teufel acknowledged "would be considered a covered loss, that would be accidental direct physical loss and we would have considered repairing or replacing the roof."

Finally, State Farm argues that there was no evidence Hanson's roof

---

[7] Hanson correctly notes that she did not designate Campbell as an expert and that the trial court sustained State Farm's objection to any expert opinion testimony by Campbell.

[8] *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009); *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004).

[9] *See Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010) (per curiam).

[10] Even if pulled-through shingles were the sole type of damage at issue, there was evidence that wind can unseal shingles, can lift unsealed shingles, and can pull shingles through their fasteners.  There was also evidence that the wind event on June 1, 2012 was strong enough to topple trees and cause tree branches to fall.  Moreover, there was evidence from Freeman explaining that overdriven staples "go straight through [the shingle] almost like a bullet hole" compared to when wind pulls the shingle through the staple resulting in tearing.

sustained physical loss on June 1, 2012. We disagree. We already have determined there was evidence to support that the shingles were in a satisfactory state prior to the June 1, 2012 storm. We already have determined that there was evidence to support that Hanson's shingles were damaged by wind. Moreover, there was evidence that a wind event occurred on June 1, 2012. Campbell testified regarding his response to the June 1, 2012 wind event; he was tarping houses and was making claims and adjuster appointments in Hanson's neighborhood the next day. Kimmel confirmed the date of the storm with Hanson's neighbors, several of whom sustained roof damage, and with the neighborhood golf course's greenskeeper. The wind was powerful enough to knock over a "tremendous" number of trees. According to Kimmel, State Farm uses precisely this type of evidence to determine the date of loss when adjusting claims. State Farm's operation guidelines list observation of neighboring properties as a factor in determining a loss. Further, wind speeds of almost 50 mph recorded at Hooks Airport—the closest "official wind gauge"—on June 1, 2012 were capable of blowing over small trees and causing branches to fall. State Farm points to no evidence, much less evidence the jury could not reasonably disregard, that supports some other specific wind event instead caused Hanson's physical loss.[11] The jury reasonably could have found that Hanson's shingles suffered accidental direct physical loss during the June 1, 2012 wind event.

We overrule this subissue.

**3. State Farm failed to conclusively establish any policy exclusion.**

Having determined Hanson met her initial burden to establish coverage

---

[11] The only other specific storm discussed was Hurricane Ike, which occurred in September 2008, several years before State Farm issued its underwriting report on Hanson's house.

under the terms of her policy, we next consider whether State Farm conclusively established that Hanson's loss falls within an exclusion to avoid liability. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010); *Francis*, 46 S.W.3d at 241. State Farm contends the evidence conclusively established that the unsealed shingles were caused by "wear and tear, deterioration, latent defect, or inadequate, faulty, or unsound workmanship or materials used in construction." State Farm's position again focuses on shingles whose only sustained damage was their unsealed nature or pulled-through tearing and fails to account for evidence of other types of (undisputed) wind damage to Hanson's shingles for which State Farm authorizes repair or replacement.

In any event, State Farm did not conclusively establish that any exclusion applies to avoid liability. State Farm's underwriting report did not indicate any concerns that would preclude or lessen coverage of Hanson's roof. Moreover, State Farm's claim file noted that Hanson's shingles were in good general condition and there was no "excessive wear and tear to the ridge shingles or to the south slope of s[h]ingles"; Traise found no "excessive wear and tear on the shingles"; West stated that Hanson's shingles were in "real good condition"; and Green testified Hanson's shingles were "excellent" and "aging extremely well." State Farm points to Green's testimony that thermal debonding caused Hanson's shingles to unseal, at least at the corners. But inspection photos reflected that the "lifted" shingles were unsealed throughout, not just at their corners. Further, Freeman testified that sealant actually becomes "better bonded" over time. Therefore, State Farm did not conclusively prove that wear and tear or deterioration caused the unsealed or pulled-through shingles, much less the other types of shingle damage.

Nor did State Farm conclusively prove that stapling defects caused the

15

unsealed or pulled-through shingles, or any other types of shingle damage. According to Teufel and Green, the overdriven staples were a latent and a construction defect. But Freeman testified that Hanson's roof only had a "handful" of overdriven staples common to "any roof." Freeman explained that a pulled-through shingle was not "overdriven" based on the space underneath the staple and where the staple did not "go down into the decking." Green acknowledged "[c]ertainly some of these staples were installed properly." And although Green opined that Hanson's entire roof needed to be replaced due to defective stapling, West did not believe that all her shingles needed to be replaced.

We overrule this second subissue.

### 4. Hanson did not have to prove any actual repair or replacement.

State Farm argues even if Hanson provided evidence that her roof sustained a covered loss, she failed to prove that she satisfied the policy's condition precedent to trigger any obligation for State Farm to make replacement cost payments. State Farm points to language within the loss settlement endorsement of Hanson's policy stating that State Farm would only pay the actual cash value at the time of the loss of the damaged part of the property, up to policy limits and not to exceed the cost to repair or replace the damaged part, "until actual repair or replacement is completed."[12]

---

[12] Under an endorsement for loss settlement, the policy provides:

A1 − Replacement Cost Loss Settlement − Similar Construction is replaced with the following:

> a. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I − COVERAGES, COVERAGE A − DWELLING, except for wood fences, subject to the following:

> > (1) until actual repair or replacement is completed, we will pay

16

A condition precedent may be either a condition to the formation of a contract or a condition to an obligation to perform an existing agreement. *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 143 (Tex. App.—Dallas 2012, no pet.) (citing *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)). In other words, conditions precedent may relate to either the formation of contracts or to the liability under them. *Id.* at 143–44. We recognize particular burdens of pleading and proof with regard to conditions precedent:

> When a plaintiff avers generally that all conditions precedent have been performed, he is required to prove the performance of only those conditions precedent specifically denied by the defendant. The effect of this rule is to shift the burden of pleading to the defendant, but not the burden of proof, when the plaintiff has made a general allegation that all conditions precedent have been performed.

*Lidawi v. Progressive Cty. Mut. Ins. Co.*, 112 S.W.3d 725, 729 n.1 (Tex. App.—Houston [14th Dist.] 2003, no pet) (citing *Trevino v. Allstate Ins. Co.*, 651 S.W.2d 8, 11 (Tex. App.—Dallas 1983, writ ref'd n.r.e.)) (emphasis omitted). Rule 54 of the Texas Rules of Civil Procedure provides:

---

only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property;

(2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;

(3) to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed; and

(4) we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under Option OL – Building Ordinance or Law Coverage.

> In pleading the performance or occurrence of conditions precedent, it shall be sufficient to aver generally that all conditions precedent have been performed or have occurred. When such performances or occurrences have been so plead, the party so pleading same shall be required to prove only such of them as are specifically denied by the opposite party.

Tex. R. Civ. P. 54.

In her petition, Hanson averred that "[a]ll conditions precedent to Plaintiff's right to recover have been fully performed, or have been waived by Defendants." By operation of rule 54, Hanson was required to prove only the conditions precedent that State Farm specifically denied. *See id.* In its answer, with regard to conditions precedent, State Farm alleged "[s]pecifically, Plaintiff has failed to prove that the alleged loss was a covered loss, and/or has failed to segregate the portion of the alleged loss which is covered from the portion of the alleged loss which is not covered." State Farm also alleged that "Plaintiff has not provided timely or adequate notice of their [sic] intent to sue." State Farm, however, did not specifically deny that Hanson was not entitled to repair or replacement costs because she had not completed actual repair or replacement.[13] Therefore, assuming without deciding actual repair or replacement was a condition precedent to Hanson's recovery of repair or replacement benefits pursuant to her policy,[14] because State Farm did not specifically deny this condition precedent, Hanson was not required to prove at trial that she had completed any actual repair or

---

[13] Traise's allegations were identical to State Farm's.

[14] State Farm relies on *Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501*, 261 S.W.3d 861, 864 (Tex. App.—Dallas 2008, pet. denied), where the Dallas court of appeals determined that the insurance policy provision at issue—"Replacement cost valuation does not apply until the damaged or destroyed property is repaired or replaced."—constituted a condition precedent to the insured's recovery under the policy. Hanson maintains *Fitzhugh 25 Partners* is distinguishable because there the insurer did not wholesale deny coverage, but rather disputed its liability for any additional replacement costs after acknowledging coverage for the insured's claim and tendering actual cash value of the damaged property.

replacement. *See id.*; *Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 203, 205 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("Inasmuch as the Bencon Parties only pleaded failure to comply with certain alleged conditions in the Prime Contract in the event that the entire Prime Contract applies to Boyer, and because the entire Prime Contract does not apply to Boyer, the Bencon Parties have not specifically denied the alleged conditions precedent in question, and Boyer did not have to prove compliance therewith.").[15]

We overrule this third subissue. Having overruled all three of its subparts, we overrule State Farm's first issue.

## B. State Farm's attorney's fee issues

Because we have concluded that the evidence is legally sufficient to support the jury's liability finding,[16] we necessarily reject State Farm's argument that the jury's attorney's fee award should be reversed because Hanson did not prevail on her contract claim. Next, we turn to State Farm's specific challenges to the attorney's fee award.

### 1. Standard of review

The prevailing party in a breach of contract suit is entitled to attorney's fees. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2013); *Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). An award of attorney's fees must be supported by evidence that the fees

---

[15] *See also Sharifi*, 370 S.W.3d at 147 (where defendant did not specifically deny conditions precedent, plaintiff did not have burden to prove they were satisfied on summary judgment); *cf. U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 200 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (where defendant specifically denied condition precedent of notice, plaintiff required to prove notice at trial).

[16] Aside from its argument relating to condition precedent, which we have overruled, State Farm does not challenge the jury's award of damages for the cost to repair or replace Hanson's roof.

19

are reasonable and necessary. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). The reasonableness of attorney's fees is generally a fact issue. *See Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010). We review attorney's fee awards for an abuse of discretion. *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 163 (Tex. 2004).

## 2. Legal sufficiency

Here, Hanson's trial counsel applied to recover their attorney's fees under the lodestar method. The lodestar method is a way to calculate total attorney's fees where the number of hours worked is multiplied by the prevailing hourly rate. *See Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014) (per curiam).

In *El Apple I, Ltd. v. Olivas*, the Supreme Court of Texas explained that generalities about tasks performed and hours spent provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary under the lodestar method. 370 S.W.3d 757, 763 (Tex. 2012). Sufficient evidence includes, at a minimum, evidence "of the services performed, who performed them and at what hourly rate, when they were performed, and how much time the work required." *Id.* at 764. Because the testimony in *El Apple* only included the total number of hours worked and generalities about discovery and the length of trial, the Court remanded for a redetermination of attorney's fees. *Id.* at 765. In so holding, the Court stated:

> In this case, neither attorney indicated how the 890 hours they spent in the aggregate were devoted to any particular task or category of tasks. Neither attorney presented time records or other documentary evidence. Nor did they testify based on their recollection of such records. The attorneys instead based their time estimates on generalities such as the amount of discovery in the case, the number of pleadings filed, the number of witnesses questioned, and the length of the trial. While all this is relevant, it provides none of the

20

specificity needed for the trial court to make a meaningful lodestar determination. The court could not discern from the evidence how many hours each of the tasks required and whether that time was reasonable. Without at least some indication of the time spent on various parts of the case, a court has little basis upon which to conduct a meaningful review of the fee award.

*Id.* at 763.

*El Apple* involved a claim under the Texas Commission on Human Rights Act, which mandates use of the lodestar method. 370 S.W.3d at 758–59. In *Long v. Griffin*, a case involving claims for breach of contract and declaratory judgment, the Court revisited the specificity requirements of evidence to support attorney's fees under the lodestar method. The Court characterized the attorney affidavit at issue as "only offer[ing] generalities":

It indicates that one attorney spent 300 hours on the case, another expended 344.50 hours, and the attorneys' respective hourly rates. The affidavit posits that the case involved extensive discovery, several pretrial hearings, multiple summary judgment motions, and a four and one-half day trial, and that litigating the matter required understanding a related suit that settled after ten years of litigation. But no evidence accompanied the affidavit to inform the trial court the time spent on specific tasks. *See El Apple*, 370 S.W.3d at 763. The affidavit does claim that 30% of the aggregate time was expended on the assignment claim (part of which the Griffins prevailed on) and that the assignment issue was inextricably intertwined with matters that consumed 95% of the two attorneys' time on the matter. But without any evidence of the time spent on specific tasks, the trial court had insufficient information to meaningfully review the fee request. [*City of Laredo v.*] *Montano*, 414 S.W.3d [731,] 736–37 [(Tex. 2013)]; *El Apple*, 370 S.W.3d at 764.

*Long*, 442 S.W.3d at 255.[17]

---

[17] *See also Montano*, 414 S.W.3d 731, 736–37 (reversing and remanding for redetermination of attorney's fees in eminent-domain case where attorney testified to time expended and hourly rate but failed to provide evidence of time devoted to specific tasks;

Recently, in a case brought by the Texas Attorney General involving claims of violations of the Texas Food, Drug, and Cosmetic Act, *see* Tex. Health & Safety Code Ann. §§ 431.001–.415 (West 2010 & Supp. 2015), our sister court considered whether evidence on attorney's fees was too general under *El Apple* and *Long* to support the judgment's award of attorney's fees. *Med. Disc. Pharmacy, L.P. v. State*, No. 01-13-00963-CV, 2015 WL 4100483, at \*17 (Tex. App.—Houston [1st Dist.] July 7, 2015, pet. filed) (mem. op.); *see also John Moore Servs., Inc. v. Better Bus. Bureau of Metro. Houston Inc.*, No. 01-14-00906-CV, 2016 WL 3162206, at \*6–7 (Tex. App.—Houston [1st Dist.] June 2, 2016, no. pet. h.) (mem. op.). There, the State presented expert testimony regarding its attorney's fees—the reasonableness and necessity of the work done on the case, the hours spent, the experience and qualifications of the timekeepers for the State, and their prevailing hourly rates. *Med. Disc. Pharmacy*, 2015 WL 4100483, at \*17. The State also submitted a computer-generated summary of the time records of the State's timekeepers. *Id.* The summary identified the case, each timekeeper, a description of activities, and the hours devoted. *Id.* The activities were divided into categories such as "attend/appear at hearing," "drafting/revising pleadings," and "reviewing/researching law." *Id.* However, the appellants argued that "the department offered only information about general categories of work[,]" and "identified no specific tasks and apportioned the time its lawyers purportedly spent only among general categories." *Id.* at \*16. They also complained that the summary did not say which hearings were attended, which pleadings were revised, and what law was researched. *Id.* at \*17.

Our sister court rejected such arguments, concluding the State's evidence of

"Gonzalez offered nothing to document his time in the case other than the 'thousands and thousands and thousands of pages' generated during his representation of the Montanos and his belief that he had reasonably spent 1,356 hours preparing and trying the case.")

22

attorney's fees was "much more detailed than that provided in *El Apple* [or] *Long*" and was sufficient for the trial court to conduct a meaningful review of the number of hours the State spent on the case and to properly apply the lodestar method. *Med. Disc. Pharmacy*, 2015 WL 4100483, at *17. In doing so, the First Court of Appeals particularly noted how "nothing in *El Apple* [or] *Long* . . . requires such detail" and found that the State's evidence was complied with *El Apple* "by indicating how long each person spent working on particular categories of tasks." *Med. Disc. Pharmacy*, 2015 WL 4100483, at *17.

Here, State Farm raises a similar complaint based on *El Apple* and *Long*. However, having reviewed Hanson's evidence, we conclude that her evidence is sufficiently detailed. Hanson presented expert testimony from Daly regarding his attorney's fees, the reasonableness and necessity of the work done on the case, his experience and qualifications and those of his two associates and the additional lawyer, John Black, brought in to help try the case, and the prevailing rates of each. Daly described keeping time in a particular computer program:

> [C]ontemporaneously whenever I do my work, I write down what the time is, who—what you were doing in your law firm and then you would write down what the task was. And then you've got a computer program that puts an hourly rate to it, whatever hourly rate you assigned and tells you who did that.
>
> So, basically, you know, on a daily or bi-weekly or, you know, every third day you will write down your time and, you know, the computer program keeps track of it. And, you know, in this case, for example, it started in October of 2012, and then the time I've written actually goes through tomorrow because we're assuming we're still going to be here tomorrow.

Hanson also submitted a ten-page computer-generated summary, which contained details regarding the nature of the work performed, who performed the services and his rate, approximately when the services were performed, and the number of

hours worked. *See El Apple*, 370 S.W.3d at 763.

State Farm challenges a particular entry that provided the total daily time spent but where the description of the work included more than one specific task.[18] Essentially, State Farm argues that *El Apple* requires assigning a particular number of minutes to each individual task. We cannot agree that such level of detail is required to be able to meaningfully review a fee award. *See John Moore Servs.*, 2016 WL 3162206, at *6–7 (concluding that "block-billing technique" was "distinguishable from *El Apple*, in which there was far less evidence of attorney's fees, and it was presented in a far more summary fashion" and "distinguishable from the aggregate and conclusory time estimates provided in *Montano*" because entries "describe the work that was done, specify the date the work was done, provide the total amount of time spent accomplishing the tasks, and identify the person who did the work."). Hanson's attorneys' time entries could be meaningfully reviewed because they included details about the nature of the work, who did it at what rate, what day the work was performed, and the time worked. *See El Apple*, 370 S.W.3d at 762. Moreover, the entries were detailed enough to provide "some indication of the time spent on various parts of the case"; the daily entry challenged by State Farm described tasks and time spent relating to formation of the attorney-client relationship and pre-suit investigation of the defendant. *See id.*

State Farm also takes issue with generalities in the summary, such as the description "Prepared for trial" provided for each attorney who billed hours on a particular trial day because "[t]hat is merely a general category for work that can

---

[18] This October 23, 2012 entry indicated that Daly worked 3.40 hours at a rate of $450.00/hour doing the following tasks: "Draft Fee Agreement. Correspond with client re same. Investigate hail claims against this particular Insurance company. Multiple conferences with consulting experts. Research regarding removal to federal court and Defendant's propensity to attempt."

24

be comp[o]sed of many specific tasks." Although State Farm acknowledges that "Prepare for trial" describes a particular category of tasks, it insists *El Apple* requires further details. We disagree. *See Med. Disc. Pharmacy*, 2015 WL 4100483, at \*17 (concluding that *El Apple* does not require more level of detail for particular category of tasks than, e.g., "attend/appear at hearing"). Even if *El Apple* required more, Daly expounded on what trial preparation entailed:

> It's the most grueling thing that you can do as a lawyer. Last night for the first time I got in bed at 11:30. Okay. That was good. The prior six nights, 2:30 in the morning is when I went to bed. The problem is you've got to go to trial, then you've got to go prepare for an entire new day. You want to be—make sure you're prepared so they don't waste your time because I don't want to come in here and bumble around and stumble around. You've got to get your exhibits ready. You've got to get—you know, your associates to make sure that everything is all set up.

Moreover, State Farm has not pointed us to, and we have not located, any daily time entries that failed to describe particular tasks or, at the least, categories of tasks, such as "prepare for trial."

We overrule State Farm's legal sufficiency challenge to the award of attorney's fees.

### 3. Rule 167 settlement offer

There is no dispute that State Farm made a rule 167 settlement offer and that Hanson did not accept the offer by the stated December 4, 2013 deadline, which constituted a rejection. *See* Tex. Rs. Civ. P. 167.2(b),[19] 167.3(c). State Farm

---

[19] Rule 167.2(b) provides:

(b) Requirements of an offer. A settlement offer must:

  (1) be in writing;

  (2) state that it is made under Rule 167 and Chapter 42 of the Texas Civil Practice and Remedies Code;

contends that pursuant to rule 167.4 it is entitled to litigation costs accruing after Hanson rejected its settlement offer.

Rule 167.4(a) provides that if a settlement offer made under the rule "is rejected, and the judgment to be awarded on the monetary claims covered by the offer is significantly less favorable to the offeree than was the offer, the court must award the offeror litigation costs against the offeree from the time the offer was rejected to the time of judgment." *Id.* 167.4(a). Rule 167.4(b) states that "[a] judgment award on monetary claims is significantly less favorable than an offer to settle those claims if: (1) the offeree is a claimant and the judgment would be less than 80 percent of the offer; or (2) the offeree is a defendant and the judgment would be more than 120 percent of the offer." *Id.* 167.4(b). Litigation costs awarded to a defendant under rule 167 "must be made a setoff to the claimant's judgment against the defendant." *Id.* 167.4(g).

Here, the judgment would need to be at least $24,000 to meet the 80 percent threshold set by the rule and entitle State Farm to an award of litigation costs. State Farm argues that the judgment was only 43 percent because it offered Hanson $30,000 and the jury only awarded her $12,878 for the cost to repair or replace her physical loss under the policy. However, State Farm's position fails to account for the attorney's fee award. Although State Farm argues that "monetary claims" do

---

(3) identify the party or parties making the offer and the party or parties to whom the offer is made;

(4) state the terms by which all monetary claims—including any attorney fees, interest, and costs that would be recoverable up to the time of the offer—between the offeror or offerors on the one hand and the offeree or offerees on the other may be settled;

(5) state a deadline—no sooner than 14 days after the offer is served—by which the offer must be accepted;

(6) be served on all parties to whom the offer is made.

Tex. R. Civ. P. 167.2(b).

not include attorney's fees for breach of contract, its settlement offer covered all Hanson's "claims for monetary damages, [her] attorney's fees, exemplary damages, interest and costs." *See* Tex. P. Civ. P. 167.2(b)(4) (settlement offer must state "terms by which all monetary claims—including any attorney fees, interest and costs that would be recoverable up to the time of the offer . . . may be settled"). Texas courts have not determined whether total attorney's fees or fees as of date of settlement rejection should be used in a rule 167.4 calculation. *See Compass Bank v. Nacim*, 459 S.W.3d 95, 110–11 (Tex. App.—El Paso 2015, no pet.). We need not reach that question because, in this case, even using the lesser amount of only accrued fees, State Farm's argument fails.[20] Here, the jury expressly found that a reasonable fee for the necessary services of Hanson's attorneys for representation before December 5, 2013, the date of the settlement rejection, was $15,000. Adding damages of $12,878 to fees of $15,000 equals $27,878. $27,878 divided by the settlement offer amount of $30,000 equals approximately 93 percent. Therefore, the trial court was not required to award State Farm litigation costs and was not required to apply any setoff.

Because we conclude that State Farm was not entitled to litigation costs against Hanson, we do not reach State Farm's argument under rule 167.4(f) that Hanson is precluded from any award of attorney's fees accruing after December 4, 2013. We overrule State Farm's challenge to Hanson's award of attorney's fees based on its rule 167 offer.

### 4. Segregation

Because attorney's fees are only recoverable pursuant to a contract or statute, "fee claimants have always been required to segregate fees between claims

---

[20] Including the total amount of attorney's fees, the judgment far exceeds the settlement offer.

for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). Texas courts recognize a narrow exception "when discrete legal services advance both a recoverable and unrecoverable claim" and thus "are so intertwined that they need not be segregated." *Id.* at 313–14; *see In re Lesikar*, 285 S.W.3d 577, 585 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("If a legal service necessary to the litigation of a claim for which attorneys' fees are available also advanced a claim for which attorneys' fees are not recoverable, then the exception to the general fee-segregation rule applies, and the amount of time or money that was reasonable to expend in performing the service need not be segregated among the claims it advanced."). However, if any attorney's fees relate solely to a claim for which attorney's fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. *Chapa*, 212 S.W.3d at 313. But, even when fee segregation is required, attorneys are not required to keep separate records documenting the exact amount of time prosecuting one claim versus another. *See id.* at 314. Rather, segregation is sufficiently established if an attorney testifies that a given percentage of the time worked would have been necessary even if the claim for which attorney's fees are unrecoverable had not been asserted. *See id.*; *Alief Indep. Sch. Dist. v. Perry*, 440 S.W.3d 228, 246 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (citing *Chapa*, 212 S.W.3d at 314, and *Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 87 (Tex. App.—Houston [14th Dist.] 2012, no pet.)).

Here, Daly stated:

> *Chapa* is a case that basically says when you have different causes of action—like here we've got a breach of contract cause of action and we've got a bad faith cause of action. And it says you need to apportion your time to each in case you're not successful on one of them.

But what basically happens is in this case we're trying to get a new roof. So 95 percent of the time that we spend on this case is towards that. And that—so in other words, the breach of—the work you do for breach of c[ontract] and bad faith is inextricably intertwined. That's the terminology they use.

I would estimate that 5 percent of the time that we've spent was spent solely on bad faith issues.

In addition, Daly testified:

Q. (By Mr. Black) So I take the number that you've got at the bottom there and it's $157,078.01. Now, the answer that you gave me about inextricably intertwining and causes of action that are so intertwined, sounded like a lawyer answer. And so I just—I want you to help me understand a little bit better what it means when you talk about separating out time and why you're doing that.

A. Sure. Let's say for example we want to go take the deposition of their expert. Now, we're going to have to drive to the deposition, ask the questions, prepare for the deposition, read the deposition, regardless of whether or not it's a breach of contract claim or a bad faith claim.

Q. And stop right there. And why does it matter that you're talking a breach of contract claim versus a bad faith claim, what's the difference?

A. I'm not sure I understand what you mean.

Q. I mean, do you get attorney's fees for both?

A. Oh, yeah, you do, you get attorney's fees for both anyway.

Q. All right. Keep going. I'm sorry I interrupted you.

A. But, if for example, you don't prevail on one of the claims or you decide, you know, we're not going to ask for any money for one of the claims, then it would be improper for a jury to say, well, you know, either you didn't ask for bad faith or you didn't prevail on the bad faith despite the fact you prevailed on the breach of contract, so we need to knock 5 percent off because you spent 5 percent of your time solely on bad faith.

Q. So if you knocked 5 percent off this bill, and I'm just going to—

MR. BLACK: The Court can take judicial notice of this or people can trust that I did the math correctly if you get cross-examined on it.

Q. (By Mr. Black) But 5 percent of that amount is $78[]53.90, which yields $149,224.11.

Is this figure under the subtotal line the figure that would represent 5 percent discounted off of your bill?

A. It is.

Q. All right. And do you think that that figure is a fair and reasonable sum to request of a jury or anyone in a case like this?

A. I think it's fair, reasonable and necessary. Yes.

There is no dispute that Hanson cannot recover attorney's fees for any claim aside from her contract claim against State Farm. As a result, Hanson generally was required to segregate fees. Hanson, however, provided evidence that 95 percent of the attorney's fees was for work related directly to prosecuting her contract claim or for work that was so intertwined with that claim and that five percent of the attorney's fees was for work attributable solely to bad faith claims.

State Farm asserts that Hanson's attempt to segregate using a percentage estimate was unsupported and therefore insufficient, relying primarily on *Farmers Group Insurance, Inc. v. Poteet*, 434 S.W.3d 316 (Tex. App.—Fort Worth 2014, pet. denied). In *Poteet*, the court of appeals remanded for a redetermination of fees in part because the insured "failed to segregate her attorney's fees related to the alleged breach of the appraisal provision from those fees incurred in pursuit of the claims upon which she did not prevail in the prior appeal from the summary judgment and the claims upon which we have held that damages are not recoverable on this appeal." *Id.* at 333. The circumstances in *Poteet* are distinguishable. Procedurally, there was a previous appeal where the appellate court affirmed a summary judgment on a multitude of claims in favor of the insurer and remanded for proceedings on the sole remaining claim of breach of the

30

policy's appraisal provision. *Id.* at 318. Moreover, in the second appeal, the *Poteet* court held that the trial court erred in failing to disregard the jury's findings regarding two of the three awards of damages resulting from the insurer's failure to comply with the appraisal provision. *Id.* at 331–32. The insured's attorney's percentage estimate based on "the entire litigation" failed to account for these circumstances. *See id.* at 332. As a result, the *Poteet* court concluded that the insured's provided estimate was insufficient under *Chapa*:

> Poteet's attorney made his "rough estimate" by lumping together hundreds of hours spent working to recover damages that Farmers had no duty to pay. Most significantly, there is no estimate of the reasonable and necessary fees incurred in pursuing the sole claim that survived the first appeal of this lawsuit.

*Poteet*, 434 S.W.3d at 333.

In contrast, Hanson's case involved one continuous proceeding in the trial court, not proceedings both pre- and post-dating a remand after appeal. In addition, we already concluded that legally sufficient evidence supports the jury's breach finding (and State Farm otherwise does not challenge the jury's actual damages award). Further, Hanson presented evidence in the form of an estimate of the reasonable and necessary fees incurred in, or at the least intertwined with, the pursuit of her contract claim.

Nevertheless, State Farm argues the only way to properly segregate is to examine each billing entry and deduct amounts that are not recoverable. *See Citizens Nat'l Bank*, 387 S.W.3d at 87–88 (attributing 66 percent of fees to Uniform Fraudulent Transfer Act case).[21] While we have held such a process sufficient, we do not necessarily require it under "the relaxed standard enunciated

---

[21] The attorney in *Citizens National Bank* explained that he performed this review "in [his] mind" and "in [his] head." 387 S.W.3d at 88.

in *Chapa*"[22]:

> Attorneys are not required to keep separate records documenting the exact amount of time working on one recoverable claim versus an unrecoverable claim. . . . Rather, segregation is sufficiently established if, for example, an attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorney's fees are unrecoverable had not been asserted.

*Perry*, 440 S.W.3d at 246 (citing *Chapa*, 212 S.W.3d at 314, and *Citizens Nat'l Bank*, 387 S.W.3d at 87). In *Alief Independent School District v. Perry*, we considered whether the plaintiff's evidence from his attorney attributing approximately "80% of his attorney's fees to each claim to each [defendant] for which fees were recoverable" was sufficient under the *Chapa* standard. *Id.* at 247. This evidence consisted of redacted invoices, as well as affidavit testimony from his attorney. *Id.* at 246. The attorney testified that all the discovery "would have been equally applicable" to the nonsuited claims. *Id.* He opined that less than ten percent of the time spent related solely to nonsuited claims. *Id.* He further estimated an additional five percent reduction for each claim for which a defendant was not liable or which was an alternative claim to account for legal research and analysis attributable only to these claims. *Id.* at 247. We held such evidence supported a conclusion that the plaintiff properly segregated his claims. *Perry*, 440 S.W.3d at 247; *see also Sentinel Integrity Sols., Inc. v. Mistras Group, Inc.*, 414 S.W.3d 911, 929–30 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (concluding evidence that attorney's fees sought were for work directly related to defense of claim or for work intertwined with such defense and that at least 90 percent of work presented in admitted bills was necessary to defend claim was sufficiently segregated per *Chapa*).

---

[22] *Citizens Nat'l Bank*, 387 S.W.3d at 88.

Here, Daly provided his opinion that the work on Hanson's case involved inextricably intertwined claims. As reflected by Daly's expert deposition example, discovery for her contract claim equally applied to her bad faith claims. Approximately 95 percent of the time, Hanson's attorneys' work went toward or was intertwined with getting Hanson a new roof pursuant to the contract. Daly estimated that five percent of the attorneys' time shown in the summary was spent solely on bad faith issues. Further, the summary is consistent with Daly's estimate. While not required by *Chapa*, *see Perry*, 440 S.W.3d at 246, the summary included daily entries describing discrete legal tasks expressly relating to Hanson's bad faith, extra-contractual, or Insurance Code claims.[23] Excising the entire amount of those daily entries reduces the total balance by just over five percent. Moreover, Daly explained that the amount included in the summary did not include every fee incurred in the course of trial, particularly for the trial days themselves:

> I mean, it is—we've put countless hours just in the past, you know, weeks preparing for this case. And so you're looking at 15, 16 hours a day. You'll see that on the bills here we put ten. It's not even close. I mean, we've got—we're here [from] 8:30 until 5:00 and then I go back straight back to the office.

*See Sentinel Integrity Sols.*, 414 S.W.3d at 929–30 (considering as part of segregation analysis testimony that bills did not include every fee incurred).

We therefore conclude that Hanson's evidence supporting her attorney's fees was sufficiently segregated under *Chapa*.

## 5. Excessiveness

Finally, State Farm contends that because the attorney's fee award of

---

[23] For the most part, we agree with State Farm's statement that "[t]he fee statement contains entries for non-recoverable fees for claims on which Hanson did not prevail." However, we do not agree that tasks involving research of State Farm's policies with regard to denial of claims or "wind lift" would necessarily only advance Hanson's non-contract claims.

$70,000 is unreasonably disproportionate to her damages award of $12,878 the trial court abused its discretion when it denied State Farm's motion for remittitur.

This court may only remit the jury's award when we determine, after evaluation of the evidence, that the award is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986) (per curiam) (factual sufficiency is proper remittitur standard). Here, the parties presented competing expert evidence regarding the reasonableness of the attorney's fees award. Daly opined that Hanson's case was difficult and complicated with regard to defenses, discovery, and legal challenges. Daly testified that just under $150,000 in attorney's fees was reasonable and necessary. Levy opined that Hanson's case was straightforward and reasonably could have been tried by a second-year associate for $30,000 to $40,000. However, even such an amount would be approximately three times more than what the jury ultimately awarded Hanson as actual damages. *See Bencon Mgmt.*, 178 S.W.3d at 209–10 (fee award of over $282,000 compared to actual damages of $81,336.83 was not factually insufficient); *see also Metroplex Mailing Services, LLC v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 900 (Tex. App.—Dallas 2013, no pet.) ("[T]here is no rule that fees cannot be more than the actual damages awarded."). The jury charge included an instruction providing eight factors to consider in determining a reasonable fee, tracking *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997), which included "the amount involved and the results obtained." Ultimately, the jury determined that a reasonable fee for the necessary services of Hanson's attorneys for trial representation was less than half of what she sought.

Based on our review of all the evidence, we cannot conclude that the jury's award is so against the great weight and preponderance of the evidence to require

remittitur.  *See Pope*, 711 S.W.2d at 624.  Therefore, the trial court did not abuse its discretion.

We overrule all of State Farm's challenges to Hanson's attorney's fee award.

### III.    CONCLUSION

Having overruled all of State Farm's issues, we affirm the trial court's judgment.


/s/    Marc W. Brown
        Justice


Panel consists of Justices Jamison, Donovan, and Brown.