**Affirmed and Memorandum Opinion filed January 14, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00679-CV

---

## GREAT SOUTHWEST REGIONAL CENTER, LLC, Appellant

## V.

## ACSWD, LP, Appellee

---

**On Appeal from the 53rd District Court
Travis County, Texas
Trial Court Cause No. D-1-GN-15-000558**

---

### M E M O R A N D U M   O P I N I O N

Appellee ACSWD, LP sued appellant Great Southwest Regional Center, LLC asserting claims arising from an investment venture. After a bench trial, the trial court signed a judgment in favor of ACSWD awarding it $500,000 in damages. Great Southwest appealed and raises issues challenging (1) ACSWD's standing to pursue its claims; (2) the trial court's interpretation of ACSWD's partnership agreement; (3) the sufficiency of the evidence supporting certain findings of fact; and (4) the trial court's awards for damages, attorney's fees, and

prejudgment interest.  For the reasons below, we affirm.[1]

## BACKGROUND

I.      **Overview of the EB-5 Investment Program and the Parties Involved in the Underlying Dispute**

The investment venture at issue sought to capitalize on the EB-5 immigrant investor program administered by the U.S. Citizenship and Immigration Services ("USCIS").  The EB-5 program permits foreign investors to obtain a green card by investing in a U.S. business that creates 10 jobs.  To accomplish this objective, the foreign investor's funds are invested in a new commercial enterprise which, in turn, deploys the funds to a job-creating entity.  This process is administered by a regional center approved by the USCIS.

Operating as a regional center, Great Southwest sponsored an EB-5 project involving salt water disposal wells in west Texas.  Great Southwest is 100% owned by Frost Rains Holdings, LLC.  Robert Frost is the Chief Executive Officer of Frost Rains Holdings and owns 66% of the company; his brother, Kenneth Frost, serves as the company's president.

Great Southwest organized ACSWD as a limited partnership to serve as the new commercial enterprise for the salt water disposal project, with Great Southwest serving as ACSWD's general partner.  Great Southwest contracted with Atlantic Investment International Group, Ltd. to locate immigrant investors for ACSWD.  ACSWD was advertised to potential investors as a $500,000 investment in exchange for a limited partnership interest in ACSWD.  The partnership

---

[1] This case was transferred to this court from the Third Court of Appeals by the Texas Supreme Court Transfer Order Misc. Docket No. 18-9083, issued June 19, 2018.  Because of the transfer, we must decide the case in accordance with the precedent of the Third Court of Appeals if our decision otherwise would have been inconsistent with that court's precedent.  *See* Tex. R. App. P. 41.3.

interests were offered pursuant to the terms of ACSWD's partnership agreement and private placement offering memorandum (the "Memorandum"). In relevant part, these documents state:

- ACSWD was organized solely for the purpose of operating as an investment limited partnership for EB-5 immigrant investors.
- ACSWD would loan 100% of its EB-5 investments to 3:16 Disposal Systems, Series LLC, which would manage the EB-5 project's salt water disposal facilities.

Lu Jun is a Chinese citizen who sought to obtain a green card through the EB-5 program. Working with Atlantic Investment, Jun agreed to invest in ACSWD and, in November 2014, wired Great Southwest $575,550 for the project: $500,000 for the EB-5 investment, $45,000 for an administration fee, $15,000 for attorney's fees, and $1,550 for miscellaneous fees. Jun signed ACSWD's "Subscription Agreement," which stated her limited partnership interest in the entity was obtained pursuant to the Memorandum. Jun also signed ACSWD's partnership agreement. No other EB-5 investors were secured for the ACSWD limited partnership and Jun served as the sole limited partner with a 99% interest.

In January 2015, Jun mailed a letter to Robert Frost requesting a refund of the $575,550 she wired for the EB-5 project. Her money was not returned.

## II. Underlying Proceedings and Bench Trial

Great Southwest sued Atlantic Investment in February 2015, asserting Atlantic Investment failed to secure the required number of EB-5 investors for the ACSWD project. Jun filed a plea in intervention, asserting claims against ACSWD, Great Southwest, and Robert Frost. Jun sought a return of the money wired to ACSWD for the EB-5 salt water disposal project.

Great Southwest's claims against Atlantic Investment were severed and

3

referred to arbitration. With respect to Jun's claims, Great Southwest, Frost Rains Holdings, and Robert Frost filed a motion to dismiss for lack of jurisdiction, asserting Jun lacked standing to pursue her lawsuit because she had executed an assignment of her claims to a separate entity: SWD Investment Recovery Fund, LLC.

Jun filed a third amended petition in intervention, stating that she, in her capacity as ACSWD's sole limited partner, removed Great Southwest as ACSWD's general partner and appointed SWD Investment Recovery Fund to the role. Jun nonsuited her claims against ACSWD and, in February 2017, ACSWD filed a plea in intervention asserting against Great Southwest, Frost Rains Holdings, Robert Frost, and Kenneth Frost claims for breach of contract, breach of fiduciary duties, and fraudulent transfer. ACSWD also requested a declaratory judgment regarding the status of ACSWD's general and limited partners.

The trial court signed an agreed order to "Realign Parties and Style of the Case". Following the realignment, ACSWD was the sole plaintiff asserting claims against Great Southwest, Frost Rains Holdings, Robert Frost, and Kenneth Frost. The parties proceeded to a bench trial in January 2018. Kenneth Frost and Jun testified at trial regarding the transactions at issue; Kenneth Lehrer, an economist, testified for Great Southwest with respect to ACSWD's claimed damages.

Much of Kenneth Frost's testimony discussed two different loans from ACSWD: one to 3:16 Disposal Systems, Series LLC (the "3:16 loan") and a later loan to Frost Rains Holdings (the "Frost Rains loan"). According to Kenneth Frost, the 3:16 loan was not "consummated" and documents evidencing the loan were signed as an "exemplar" of how the loan to 3:16 Disposal Systems, Series LLC would be undertaken. The promissory note for the Frost Rains loan was dated approximately four months after the 3:16 loan and contained less favorable

4

terms. Kenneth Frost said the Frost Rains loan was undertaken when it became clear that the company intended to supervise operations under the 3:16 loan would be unable to complete its obligations. The proceeds from the Frost Rains loan were deposited into Frost Rains Holdings' general bank account and used to pay expenses incurred by Frost Rains Holdings, including car loans and credit card bills.

After the parties rested, the trial court signed a final judgment in favor of ACSWD and against Great Southwest, Frost Rains Holdings, Kenneth Frost, and Robert Frost.[2] The trial court awarded ACSWD $500,000 in damages, pre- and post-judgment interest, and attorney's fees. The trial court's final judgment also included a declaratory judgment stating:

1. Great Southwest was removed as ACSWD's general partner and became a limited partner without the right to vote owning a .99% interest.
2. SWD Investment Recovery Fund became the general partner of ACSWD with a 1% interest.
3. Jun's limited partnership interest was reduced from 99% to 98.01%.

Approximately eight weeks after signing the final judgment, the trial court issued findings of fact and conclusions of law. The trial court concluded Great Southwest breached the fiduciary duties it owed to ACSWD and, through the execution of the Frost Rains loan, engaged in a "self-dealing, interested transaction." The trial court determined the Frost Rains loan benefited Great Southwest "at the expense and to the detriment of ACSWD." The trial court stated that, because of these breaches, ACSWD suffered $500,000 in damages.

The trial court also concluded that the Frost Rains loan constituted a breach of ACSWD's partnership agreement and the Memorandum. The trial court

---

[2] Great Southwest is the only defendant that appealed the trial court's final judgment.

determined these breaches of contract caused ACSWD to suffer $500,000 in damages.

Great Southwest timely appealed.

**ANALYSIS**

Great Southwest asserts six issues on appeal:

1. The trial court lacked jurisdiction to hear ACSWD's claims.

2. The trial court misapplied ACSWD's partnership agreement when it declared that SWD Investment Recovery Fund was ACSWD's general partner.

3. Insufficient evidence supports certain findings of fact.

4. The trial court erred in awarding damages against Great Southwest on the basis of the Memorandum.

5. The trial court's attorney's fee award improperly includes fees incurred for claims on which ACSWD did not prevail.

6. The trial court's pre-judgment interest award is improperly computed as compound interest and commences on the wrong date.

We address these issues below.

## I. Jurisdiction Over ACSWD's Claims

Asserting the trial court lacked subject matter jurisdiction over ACSWD's breach of contract and breach of fiduciary duty claims, Great Southwest contends the claims are not ripe for adjudication because, "until the time for payment has passed, it is pure speculation whether ACSWD will suffer any damage" from the differences between the 3:16 loan and the Frost Rains loan. Therefore, Great Southwest argues, there is "no evidence" ACSWD was injured as necessary to pursue its claims.

### A. Governing Law and Standard of Review

Ripeness is a threshold issue that implicates the trial court's subject matter

6

jurisdiction. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 851 (Tex. 2000); *Rea v. State*, 297 S.W.3d 379, 383 (Tex. App.—Austin 2009, no pet.). A claim is ripe if, at the time the lawsuit was filed, the facts involved show that "'an injury has occurred or is likely to occur.'" *City of Austin v. Whittington*, 385 S.W.3d 28, 33 (Tex. App.—Austin 2007, no pet.) (quoting *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*, 971 S.W.2d 439, 442 (Tex. 1998)). In other words, there must be a concrete injury for the claim to be ripe. *See Atmos Energy Corp. v. Abbott*, 127 S.W.3d 852, 857 (Tex. App.—Austin 2004, no pet.). A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *City of Austin*, 385 S.W.3d at 33.

To determine whether a plaintiff's claims are ripe, we look to the facts and evidence existing when the suit was filed. *Lindig v. City of Johnson City*, No. 03-08-00574-CV, 2009 WL 3400982, at *5 (Tex. App.—Austin Oct. 21, 2009, no pet.) (mem. op.) (citing *Waco Indep. Sch. Dist.*, 22 S.W.3d at 851-52). We review "the entire record to ascertain if any evidence supports the trial court's subject matter jurisdiction." *Perry v. Del Rio*, 66 S.W.3d 239, 260 (Tex. 2001); *see also Waco Indep. Sch. Dist.*, 22 S.W.3d at 853.

Where, as here, the trial court did not make separate findings of fact and conclusions of law regarding jurisdiction, we imply such findings as necessary to support the conclusion that the trial court had subject matter jurisdiction. *See Anderson Mill Mun. Util. Dist. v. Robbins*, 584 S.W.3d 463, 473 (Tex. App.—Austin 2005, no pet.). We review these implied findings for sufficiency of the evidence. *See In re K.S.*, 492 S.W.3d 419, 424 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). But the ultimate determination of whether particular facts establish subject matter jurisdiction is one we review *de novo*. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998); *Reynolds v. Reynolds*, 86 S.W.3d

7

272, 275 (Tex. App.—Austin 2002, no pet.).

Here, we construe Great Southwest's "no evidence" argument as a legal sufficiency challenge to the trial court's implied jurisdictional findings. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *Wichita Cty. v. Envtl. Eng'g & Geotechnics, Inc.*, 576 S.W.3d 851, 861 (Tex. App.—Austin 2019, no pet.). Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the finding under review. *Wichita Cty.*, 576 S.W.3d at 861-62. We credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a reasonable fact finder could not. *Id.* at 862. We sustain a no evidence challenge only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) we are barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.*

## B.  Application

Contrary to Great Southwest's argument, the record contains legally sufficient evidence supporting the trial court's implied finding that, at the time ACSWD intervened in the underlying proceeding in February 2017, ACSWD was or was likely to be injured by Great Southwest's actions.

ACSWD's partnership agreement states that ACSWD was organized to operate as an investment vehicle for EB-5 immigrant investors. Consistent with this purpose, the partnership agreement states ACSWD would "make loans to a multi-phase business that will own and operate salt water disposal facilities" for the purposes of job creation pursuant to the EB-5 program. The Memorandum stated the partnership would invest 100% of its investors' capital in 3:16 Disposal Systems, Series LLC, which would own and operate the salt water disposal

8

facilities.

Admitted into evidence at trial were documents evidencing the 3:16 loan from ACSWD to 3:16 Disposal Systems, Series LLC. These documents included: (1) a "Senior Secured Loan Agreement" dated January 5, 2015; (2) a "Sinking Fund Agreement", and (3) a "Job Creation Guarantee Agreement". Pursuant to these documents, ACSWD agreed to advance to 3:16 Disposal Systems, Series LLC a principal amount not to exceed $2.5 million at a 7% interest rate that would be paid monthly. The loan would be repaid through a sinking fund whereby 20% of the total amount borrowed would be deposited yearly into a dedicated bank account until the loan was repaid in full after five years.

Testifying at trial, Kenneth Frost said these loan documents were signed as an "exemplar" of how the 3:16 loan would be undertaken. Kenneth Frost said the 3:16 loan was "not a consummated loan" and that "there were no funds loaned" when the documents were signed.

According to Kenneth Frost, the 3:16 loan contemplated that Advanced Construction would be involved throughout the project. Kenneth Frost said he and Robert Frost became concerned about Advanced Construction's role in the project when Advanced Construction started "having trouble paying the bills."

Responding to these concerns, Kenneth Frost testified that Great Southwest (as ACSWD's general partner) executed the $500,000 Frost Rains loan instead of the 3:16 loan and Frost Rains Holdings took over the duties intended for Advanced Construction. The Frost Rains loan document was dated May 29, 2015, and Robert Frost signed for both ACSWD (as the lender) and Frost Rains Holdings (as the borrower). Under the terms of the Frost Rains loan, ACSWD agreed to advance $500,000 to Frost Rains Holdings at a 1% interest rate. The loan was unsecured and the principal was due in a balloon payment five years from the date

9

the loan was executed.

Pursuant to the terms of the Frost Rains loan, ACSWD transferred the $500,000 to Frost Rains Holdings; this amount represented "virtually all of the capital of ACSWD at the time." Frost Rains Holdings deposited the $500,000 into its general bank account, commingled with the account's other funds. Before it received the ACSWD loan proceeds, Frost Rains Holdings had approximately $28,000 in its general bank account. After Frost Rains Holdings received the ACSWD loan proceeds, funds were disbursed from Frost Rains Holdings' general bank account to pay for loans on three vehicles, Frost Rains Holdings' consultant who traveled internationally to solicit EB-5 investors, and Frost Rains Holdings' American Express credit card bill. Kenneth Frost said the loan benefited Frost Rains Holdings and allowed it to pursue its business model regarding the development of salt water recycling facilities in west Texas.

Viewing this evidence in the light most favorable to the trial court's implied findings, legally sufficient evidence shows ACSWD was injured at the time it intervened in the underlying case in February 2017. ACSWD's partnership agreement and the Memorandum stated ACSWD would invest its capital in an entity that would own and operate salt water disposal facilities for the purpose of job creation under the EB-5 program. The 3:16 loan documents demonstrated this loan and contained favorable terms: a fully-secured loan at a 7% interest rate repaid through a sinking fund. But, according to Kenneth Frost, this loan was not consummated and ACSWD's funds instead were loaned to Frost Rains Holdings under less favorable terms: an unsecured loan at a 1% interest rate repaid through a balloon payment due five years after the loan's execution. The evidence shows the entirety of these funds was not spent solely on the operation of salt water disposal facilities — rather, some of this money was expended for Frost Rains Holdings'

general expenses, including vehicle loans and credit card bills. This evidence shows a significant variance between ACSWD's stated purpose and Frost Rains Holdings' use of the loan proceeds, as well as changes between the loans' terms that were not to ACSWD's advantage. These facts, which existed at the time ACSWD intervened in the underlying suit, support the implied finding that ACSWD was injured and that its claims were ripe for adjudication. *See Waco Indep. Sch. Dist.*, 22 S.W.3d at 851-52; *City of Austin*, 385 S.W.3d at 33.

To support its ripeness challenge, Great Southwest relies solely on the testimony of its expert, Lehrer. In his testimony, Lehrer emphasized that the payment period for the Frost Rains loan had not elapsed. Lehrer asserted that, because the Frost Rains loan was not due, it was "impossible" to provide an opinion regarding the damages ACSWD suffered due to the differences between the 3:16 loan and the Frost Rains loan. According to Lehrer, these types of damages are "speculative" and "cannot be determined in the middle of a term of a loan."

But Great Southwest does not cite any case law or other authority to support its argument that speculative damages foreclose the ripeness of a claim. Moreover, ripeness examines whether the facts involved show that an ***injury*** has occurred or is likely to occur — not whether all damages may be definitively ascertained.[3] *See MCMC Auto Ltd. v. SideCars, Inc.*, No. 02-18-00094-CV, 2018 WL 5289376, at *6 (Tex. App.—Fort Worth Oct. 25, 2018, no pet.) (mem. op.) (concluding the plaintiff's breach of contract claim accrued when the contract was breached, the

---

[3] We note the ripeness analysis differs with respect to torts asserted against an insurer; a party injured by an insured cannot enforce the insurance policy directly against the insurer until it has been established, by final judgment or agreement, that the insured has a legal obligation to pay damages to the injured party. *See, e.g., Angus Chem. Co. v. IMC Fertilizer, Inc.*, 939 S.W.2d 138, 138 (Tex. 1997) (per curiam); and *Farmers Ins. Exch. v. Rodriguez*, 366 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

11

court rejected the appellant's ripeness argument premised on the fact that all resulting damages had not occurred when suit was filed); *Vanderweyst v. Boudreaux*, No. 01-02-00928-CV, 2003 WL 22255833, at *4 (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem. op.) (appellant's argument that claim was not ripe because damages were "impossibly speculative" was not an issue that warranted a dismissal for lack of ripeness).  Here, the evidence supports the conclusion that, when ACSWD intervened in the underlying suit, an injury was likely to occur.  This injury is sufficient to support the conclusion that ACSWD's claims were ripe for adjudication.  *See City of Austin*, 385 S.W.2d at 33.

We overrule Great Southwest's first issue.

## II.    ACSWD's Partnership Agreement

In her third amended petition, Jun stated that she, in her capacity as ACSWD's sole limited partner, removed Great Southwest as ACSWD's general partner and appointed SWD Investment Recovery Fund to the role.  Jun then nonsuited her claims against ACSWD and ACSWD intervened in the suit.  ACSWD requested a declaratory judgment stating that Jun (1) properly removed Great Southwest from its role as ACSWD's general partner, and (2) properly appointed SWD Investment Recovery Fund as successor general partner.

In its final judgment, the trial court declared: (1) Great Southwest was removed as ACSWD's general partner and became a limited partner; (2) SWD Investment Recovery Fund became the general partner of ACSWD; and (3) Jun's limited partnership interest was reduced from 99% to 98.01%.

Challenging the trial court's second declaration, Great Southwest argues the trial court improperly construed ACSWD's partnership agreement when it declared SWD Investment Recovery Fund properly was appointed as ACSWD's general

partner.

## A. Rules of Contract Interpretation

When a court concludes that contract language can be given a "certain or definite legal meaning," then the language is not ambiguous and the court "will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see also Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 154 (Tex. App.—Austin 2017, pet. denied). The parties do not contend ACSWD's partnership agreement is ambiguous. We construe the agreement as a matter of law.

The primary goal of contract interpretation is to ascertain the parties' intent as it is expressed in the instrument. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005); *see also Elness Swenson Graham Architects, Inc.*, 520 S.W.3d at 154. We give words their plain, common, or generally-accepted meanings unless the instrument shows the parties intended to use them in a technical or different way. *Mid-S. Telecomms. Co. v. Best*, 184 S.W.3d 386, 390 (Tex. App.—Austin 2006, no pet.). We avoid interpretations that are unreasonable, inequitable, or oppressive. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam).

We construe the instrument as a whole in an effort to harmonize and give effect to all of its provisions so that none are rendered meaningless. *Mid-S. Telecomms. Co.*, 184 S.W.3d at 390. When two provisions conflict, the more specific provision controls over the more general provision. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994).

## B. Application to ACSWD's Partnership Agreement

Resolution of this issue rests on two sections of ACSWD's partnership

agreement: section 13, which governs the limited partners' rights and powers, and section 14, which lists prohibited transactions. Section 13, in relevant part, states as follows:

**13.2  Removal of a General Partner:**

A.  Upon written notice to the General Partner, Limited Partners owning at least seventy-five percent (75%) of the Limited Partners' Interests may remove the General Partner for cause. As used herein, the term "cause" shall mean (i) a General Partner's action in violation of any one or more of the prohibitions set forth in Article XIV of this Agreement, (ii) the issuance of a charging order or writ of attachment or other action, against a General Partner's interest in the Partnership, (iii) any action or omission by a General Partner which constitutes fraud, deceit, or a wrongful taking, or (iv) the death, dissolution or bankruptcy of a General Partner.

B.  Upon written notice to the General Partner, the Limited Partners owning at least seventy-five percent (75%) of the Limited Partners' Interests may remove a General Partner without cause.

C.  ***Upon the removal of a General Partner as provided above, all remaining Partners may agree in writing to continue the business of the Partnership and to appoint a new successor general partner meeting the requirements of Section 13.3***.

*          *          *

**13.3  Successor General Partner:**

*A person or entity shall qualify as a successor general partner only upon satisfaction of the following conditions*:

A.  The person or entity shall have accepted and agreed to be bound by all the terms and provisions of this Agreement, by executing a counterpart hereof and any other such document or instrument as may be required or appropriate in order to effect the admission of the person or entity as a substitute General Partner;

B.  The person or entity shall have a net worth which will be sufficient to meet all then-current requirements of applicable

statutes, cases, treasury regulations or IRS rulings to ensure classification of the Partnership as a partnership for federal income tax purposes;

C.   The person or entity shall make any such contribution to the capital of the Partnership as may be determined by Majority Vote of the Limited Partners; and

D.   An amendment to this Agreement and to the Partnership's Certificate of Limited Partnership evidencing the admission of the person or entity as a successor General Partner shall be filed for recondition, as required by the Act.

(emphasis added).  The relevant portion of section 14 states:

**14.1   Prohibited Transactions:**

During the term of this Partnership, neither a General Partner nor any Limited Partner shall do any one of the following:

\*          \*          \*

I.   Do any of the following, or allow any of the following to occur, ***without first obtaining the written consent of the General Partner and Limited Partners*** owning more than fifty percent (50%) of the Sharing Ratios owned by all the Limited Partners:

\*          \*          \*

iv.   ***The admission of another person or entity as a General or Limited Partner***, except as provided in Section 16.3 regarding the admission of transferees of a Limited Partner's Interest as substitute Limited Partners.

(emphasis added).

Great Southwest asserts that section 14.1(I)(iv) prohibits a limited or general partner from "admi[tting] . . . another person or entity as a General or Limited Partner" without "first obtaining the written consent of the General Partner and Limited Partners owning more than fifty percent (50%) of the Sharing Ratios owned by all the Limited Partners."  Arguing that this section mandates general-partner approval for the admission of any new ACSWD partner, Great Southwest

15

asserts SWD Investment Recovery Fund could not be admitted to ACSWD —
much less appointed ACSWD's general partner — without the consent of a general
partner. According to Great Southwest, because there was no general partner, the
general partner's approval could not be obtained and SWD Investment Recovery
Fund could not be admitted to ACSWD.

We reject Great Southwest's interpretation of the partnership agreement.
Read in isolation, section 14.1(I)(iv) appears to prohibit the admission of a
successor general partner without the current general partner's written consent.
But read in conjunction with other relevant sections of the partnership agreement,
this interpretation cannot stand.

Sections 13.2 and 13.3 prescribe the specific procedures limited partners
may utilize to remove ACSWD's general partner and appoint a successor general
partner.

- Section 13.2 states the limited partners owning at least 75% of the limited partners' interest can, upon written notice, remove the general partner with or without cause.

- Upon this removal, the "remaining partners may agree in writing to continue the business of the Partnership **and to appoint a new successor general partner** meeting the requirements of section 13.3." (emphasis added).

- Section 13.3 provides the successor general partner may be appointed after satisfying four conditions: (1) the successor general partner accepts and agrees to be bound by the partnership agreement; (2) the successor general partner has a sufficient net worth; (3) the successor general partner makes a capital contribution; and (4) the partnership agreement is amended.

These sections — which directly apply to the situation at issue here, *i.e.*, the
appointment of a successor general partner — do not condition a successor general
partner's appointment on the approval of the current general partner. Rather,

16

section 13.2 specifically states that, after the general partner's removal, the *remaining partners* may agree to appoint a new general partner. This language encompasses the actions taken here: after Great Southwest was removed as general partner, the remaining partner (Jun) appointed the successor general partner (SWD Investment Recovery Fund). Likewise, section 13.3 — which lists the conditions that must be satisfied before a successor general partner may be appointed — does not require approval from the current general partner.

In contrast to the specific directives of sections 13.2 and 13.3, section 14.1(I)(iv) broadly conditions the admission of *any* partner on the consent of "the General Partner and Limited Partners owning more than fifty percent (50%) of the Sharing Ratios owned by all the Limited Partners." This statement regarding partner admission does not control over the specific provisions directly applicable to the situation presented here. *See Forbau*, 876 S.W.2d at 133-34.

Moreover, Great Southwest's asserted interpretation of the partnership agreement would abrogate section 13.2's procedures for the appointment of a successor general partner and section 13.3's list of necessary conditions to precede the appointment. We decline to adopt an interpretation that would render these provisions meaningless. *See Mid.-S. Telecomms. Co.*, 184 S.W.3d at 390.

Great Southwest also cites Texas Business Organizations Code section 1.002(33) to support its contention that "[a] general partner must first be a partner." This section states:

"General partner" means:
- (A)    each partner in a general partnership; or
- (B)    a person who is admitted to a limited partnership in accordance with the governing documents of the limited partnership.

17

Tex. Bus. Orgs. Code Ann. § 1.002(33) (Vernon Supp. 2019). As discussed above, SWD Investment Recovery Fund properly was admitted to ACSWD as a general partner under the terms of ACSWD's partnership agreement. Therefore, section 1.002(33) does not support Great Southwest's claim that general-partner approval was necessary to appoint SWD Investment Recovery Fund as ACSWD's general partner.

We overrule Great Southwest's second issue.

### III.        Great Southwest's Sufficiency Challenges

Great Southwest asserts two of the trial court's findings of fact are not supported by sufficient evidence: (1) "that [Frost Rains Holdings] was a related party," and (2) "that the [Memorandum] obligated ACSWD to loan its capital to Advanced Construction."

Where, as here, the trial court issues specific findings of fact, an appellant may challenge the legal and factual sufficiency of those findings. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 793 (Tex. 2002). A legal sufficiency challenge will succeed only upon proof that not even a scintilla of evidence can be found in the record to support the challenged finding. *Id*. at 795. A factual sufficiency challenge requires proof that, considering the entire record, the trial court's finding was so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Goodenbour v. Goodenbour*, 64 S.W.3d 69, 75 (Tex. App.—Austin 2001, pet. denied).

Although it asserts a challenge to the trial court's finding "that [Frost Rains Holdings] was a related party," Great Southwest also states in its appellate brief that "[t]here is no dispute that [Frost Rains Holdings] was a related party."

Setting aside this apparent concession, the trial court's findings of fact do

not include the statement that Frost Rains Holdings "was a related party." We therefore construe Great Southwest's argument as a challenge to the trial court's findings of fact made with respect to the relationships between Great Southwest, Frost Rains Holdings, and Robert Frost. *See Trammell v. Trammell*, 485 S.W.3d 571, 576 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("a challenge to an unidentified finding of fact may be sufficient for review if the specific findings of fact which the appellant challenges can be fairly determined from the argument, the nature of the case, or the underlying legal theories"); *Shaw v. Cty. of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied) (same). These findings state:

30. At the time of the [Frost Rains loan], Great Southwest was the general partner of ACSWD, the lender in the transaction with Frost Rains.

31. At the time of the [Frost Rains loan], Frost Rains owned 100% of Great Southwest and was the controlling member of Great Southwest.

32. Robert Frost is the President and Chief Executive Officer of Frost Rains, the borrower in the transaction. Robert Frost is also the majority owner of Frost Rains.

33. Robert Frost is also the Chief Executive Officer and President of Great Southwest.

34. Robert Frost signed the loan on behalf of both the lender, ACSWD, and the borrower, Frost Rains. Robert Frost controlled both ACSWD and Frost Rains at the time of the [Frost Rains loan].

These findings are supported by legally and factually sufficient evidence. In his testimony, Kenneth Frost described these relationships between Great Southwest, Frost Rains Holdings, and Robert Frost. These relationships also are evidenced by the following exhibits admitted at trial: (1) the "ACSWD, EB-5 Investor Immigration Project" power point that gave potential investors information about

19

the project; (2) the Memorandum; (3) ACSWD's partnership agreement; and (4) the Frost Rains loan documents. No evidence suggests the relationships delineated by these fact findings do not exist. We therefore reject Great Southwest's challenge to these findings.

Great Southwest also challenges the trial court's finding that the Memorandum "obligated ACSWD to loan its capital to Advanced Construction." Great Southwest argues that "undisputed evidence" shows that "Advanced Construction was not capable of performing the obligations originally contemplated."

The trial court, however, did not make this finding regarding Advanced Construction — in fact, none of the trial court's findings of fact or conclusions of law mention Advanced Construction. Moreover, the Memorandum does not state that ACSWD would loan its investment capital to Advanced Construction. Instead, the Memorandum states that ACSWD would "loan 100% of its investors' capital to a multi-location business that will own and operate a series of salt water disposal facilities, servicing the oil and gas industry throughout Texas." The Memorandum states that this business is incorporated as 3:16 Disposal Systems, Series LLC. We cannot square Great Southwest's argument with either the trial court's findings or the Memorandum.

We overrule Great Southwest's third issue.

## IV. Great Southwest's Challenge to the Trial Court's Damages Award

In its final judgment, the trial court awards ACSWD $500,000 in actual damages. In a single paragraph, Great Southwest summarily asserts that the Memorandum cannot support the assessed damages because the Memorandum "is not a contract between ACSWD and Great Southwest." Great Southwest contends that it "cannot be held liable to ACSWD for breach of contract on the basis of any

20

obligation not set forth in the partnership agreement."

We reject this argument for two reasons. First, Great Southwest cites no authority to support this challenge and does not direct its argument towards any specific findings of fact or conclusions of law. Because Great Southwest does not adequately explain or support this contention, the issue is inadequately briefed. *See* Tex. R. App. P. 38.1(i) (appellant's brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record); *see also, e.g., McClain v. Byrne*, No. 03-16-00216-CV, 2016 WL 4506304, at *1 (Tex. App.—Austin Aug. 24, 2016, pet. dism'd) (mem. op.); *Prof'l Res. Plus v. Univ. of Tex., Austin*, No. 03-10-00524-CV, 2011 WL 749352, at *1 (Tex. App.—Austin Mar. 4, 2011, no pet.) (mem. op.). By not adequately briefing the argument, Great Southwest has waived appellate review of it.

Second, even absent the briefing waiver, we would reject Great Southwest's argument because it ignores that in its conclusions of law with respect to ACSWD's breach of contract claim the trial court assesses $500,000 in damages for breaches of **both** the Memorandum and ACSWD's partnership agreement. Failing to address all legal theories pertinent to this damages assessment, Great Southwest does not argue that the partnership agreement is an improper basis for the award. *See Westech Eng'g, Inc. v. Clearwater Constructors, Inc., a Div. of Phelps, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ) ("Conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence."). Moreover, Great Southwest does not challenge the trial court's findings of fact regarding breaches of the partnership agreement or the evidence supporting these findings. *See Hegar v. CGG Veritas Servs. (U.S.), Inc.*, 581 S.W.3d 228, 233 (Tex. App.—Austin 2016, no pet.) (mem. op.) ("Unchallenged findings of fact are binding on an appellate court unless the

21

contrary is established as a matter of law or there is no evidence to support the finding."). Great Southwest's argument therefore fails.

We overrule Great Southwest's fourth issue.

## V.        Trial Court's Attorney's Fees Award

In its final judgment, the trial court awarded ACSWD $91,928.46 in attorney's fees. Challenging this award, Great Southwest argues ACSWD failed to segregate its fees and improperly recovered for services rendered in conjunction with Jun's representation. Great Southwest raised this argument in the trial court and preserved the issue for our review. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997); *Barton Food Mart, Inc. v. Botrie*, No. 03-17-00292-CV, 2018 WL 5289538, at *9 (Tex. App.—Austin Oct. 25, 2018, pet. denied) (mem. op.).

Attorney's fees may be recovered when permitted by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006); *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 267 (Tex. App.—Austin 2002, no pet.). The party seeking attorney's fees has a duty to segregate fees incurred in prosecuting a claim for which attorney's fees may be recovered from those in which fees may not be recovered. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991); *W. Beach Marina, Ltd.*, 94 S.W.3d at 267. Segregation is sufficiently established if an attorney testifies that a given percentage of fees would have been incurred even if the claim for which attorney's fees are unrecoverable had not been asserted. *See Chapa*, 212 S.W.3d at 314; *see also State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 102 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 320 (Tex. App.—Dallas 2009, pet. denied).

22

Here, ACSWD was entitled to attorney's fees for its declaratory judgment and breach of contract claims. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 37.009, 38.001(8) (Vernon 2015). The trial court awarded ACSWD $91,928.46 in fees and, in its findings of fact, stated that it "considered only those fees and expenses related to claims for which attorney's fees are recoverable." Sufficient evidence supports this finding and shows ACSWD properly segregated its recoverable fees from those that are not recoverable.

To address the fees earned in connection with its claims, ACSWD offered into evidence (1) 86 pages of billing statements and (2) the affidavit of its counsel, William Johnson. Johnson also testified at trial. According to Johnson's testimony and affidavit, his law firm took over the case in March 2016 and represented both Atlantic Investment and Jun. At this time, Great Southwest's claims against Atlantic Investment had been submitted to arbitration and Jun remained an intervenor in the case asserting claims against ACSWD, Great Southwest, and Robert Frost. Johnson testified that, from March 2016 through February 2017, his firm earned fees in connection with claims arising from the Frost Rains loan as well as fees for Jun's personal claims.

Referencing the billing statements admitted into evidence, Johnson said his firm incurred $45,433.99 in fees and expenses for this March 2016-February 2017 time period. Johnson testified that he segregated fees related to claims that did not arise from the Frost Rains loan (including Jun's personal claims) and reduced this amount to $31,344.14.

In February 2017, Jun nonsuited her claims against ACSWD and ACSWD filed a plea in intervention asserting claims against Great Southwest, Frost Rains Holdings, Robert Frost, and Kenneth Frost. Johnson testified that his firm incurred $24,263.32 in fees from February 2017 through the beginning of trial; Johnson said

23

this amount was discounted to account for claims for which fees were not recoverable, including any individual claims related solely to Jun. Totaling the amounts from March 2016 through the beginning of trial, Johnson testified his firm reasonably incurred a total of $51,928.46 in fees and costs — an amount that excluded fees incurred with respect to Jun's personal claims. Johnson testified that his firm would incur approximately $40,000 in additional fees and expenses through the conclusion of trial. In sum, this uncontroverted evidence supports the finding that ACSWD's fee amounts were segregated to exclude fees incurred in conjunction with Jun's claims and supports the trial court's $91,928.46 award.

We overrule Great Southwest's fifth issue.

## VI. Pre-Judgment Interest Assessment

The trial court's final judgment awards ACSWD $500,000 in actual damages and assesses "[p]re-judgment interest at the rate of 5% compounded annually, from June 4, 2015, through May 7, 2018, in the amount of $76,973.47." Challenging the pre-judgment interest assessment, Great Southwest asserts (1) pre-judgment interest should be simple rather than compound, and (2) "[n]o basis" exists to commence the pre-judgment interest on June 4, 2015.

To preserve a complaint for appellate review, a party must "invok[e] a procedure in the trial court that apprises the trial court of the party's argument in a way that allows the trial court to decide the issue." *Elness Swenson Graham Architects, Inc.*, 520 S.W.3d at 159 (citing Tex. R. App. P. 33.1(a)). The Texas Supreme Court expressly has held that a complaint regarding the interest assessed in a final judgment must be presented to the trial court to preserve error for appellate review. *See Plasky v. Gulf Ins. Co.*, 335 S.W.2d 581, 584 (Tex. 1960) (appellant waived error concerning time period applicable to post-judgment interest); *see also Morton v. Nguyen*, 369 S.W.3d 659, 677 (Tex. App.—Houston

[14th Dist.] 2012) ("A complaint regarding the award of pre-judgment interest must be preserved in the trial court by a motion to amend or correct the judgment or by a motion for new trial."), *rev'd in part on other grounds*, 412 S.W.3d 506 (Tex. 2013); *C & K Invs. v. Fiesta Grp., Inc.*, 248 S.W.3d 234, 255 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (appellant did not preserve complaint regarding a post-judgment interest rate where appellant did not raise complaint in the trial court); *Hachar v. Hachar*, 153 S.W.3d 138, 145 (Tex. App.—San Antonio 2004, no pet.) (same).

Here, the record does not show Great Southwest apprised the trial court of its complaints regarding the pre-judgment interest assessed in the trial court's final judgment. Great Southwest therefore did not preserve this issue for our review. *See Plasky*, 335 S.W.2d at 584; *Elness Swenson Graham Architects, Inc.*, 520 S.W.3d at 159.

We overrule Great Southwest's sixth issue.

## CONCLUSION

We overrule Great Southwest's issues on appeal and affirm the trial court's final judgment.


/s/ Meagan Hassan
Justice


Panel consists of Chief Justice Frost and Justices Wise and Hassan.

25